Rosa A. BLASINGAME, Appellant,
Plaintiff in Error,

v.

Ray GATHRIGHT, Executor of the Estate
of W. A. Blasingame, Defendant in
Error.

No. 36422.

Supreme Court of Oklahoma.

May 17, 1955.

R. R. Linker, Tulsa, for plaintiff in error.

Hamilton & Kane, Pawhuska, Gray &
Palmer, Pawhuska, for defendant in error.

J. C. Cornett, Pawhuska, for First Pres-
byterian Church.

ARNOLD, Justice.

This action began in the County Court of
Osage County in the proceedings to probate

the will of Wade A. Blasingame, deceased; Rosa A. Blasingame, surviving widow of Wade A. Blasingame, deceased, filed her election to take under the law of descent and distribution instead of under the terms of said will. The County Court denied such election to take and distributed the estate pursuant to the provisions of the will. Thereupon the widow appealed to the District Court of Osage County where trial de novo was had, resulting in an affirmance of the County Court. This appeal is from the judgment of the District Court affirming the judgment of the County Court denying her election to take as heir at law.

The evidence of the widow, plaintiff in error here, is to the effect that she had been engaged in business for thirty years; that as long as her former husband, Mr. Lovelace, had his health she and he were in the drug business; and after his health failed she converted the business into a cosmetic business, which she conducted for ten years; that prior to her marriage to the deceased Wade A. Blasingame she had known him and his family for several years; that she and Wade A. Blasingame were married on June 3, 1950; that prior to their marriage she and Mr. Blasingame, who was a widower of advanced years with no children of his own but who owned considerable real estate, discussed the property that each owned in detail; that prior to their marriage, on June 2, 1950, at Mr. Blasingame's request, she went to the office of his attorneys and there signed an antenuptial agreement; that she did not read the instrument before signing it or know its contents but she thought she understood what it meant when she signed it; that before she signed the instrument Mr. Blasingame's lawyer suggested that she obtain the service of a lawyer to advise her but she stated she did not care to as she had confidence in the man she was marrying; that after signing the instrument Mr. Blasingame accompanied her back to her place of business, where she told her employees and a friend who was visiting her that she had signed a marriage contract and she supposed she had "signed her life away"; that she was not furnished a copy of the contract before signing it; that at the time of her marriage to Mr.

Blasingame she had $5,200 in cash and her cosmetic store; she offered testimony, which was refused by the court, to the effect that at the suggestion of Mr. Blasingame after their marriage she disposed of her cosmetic business and spent the $5,200 in improvements on the home owned by Mr. Blasingame; the antenuptial agreement was introduced in evidence, which related that each party thereto had advised the other as to all the property which he or she had and the approximate value thereof, and that each agreed that the other might use, possess, convey, and dispose of all property which she or he had to the same extent that she or he could have done had the marriage not taken place and each released any claim to the property of the other and agreed to make no claim to any property of which the other might die seized, and that each might bequeath or devise away from the other all of his or her property; the will of Wade A. Blasingame, dated January 4, 1951, and the codicil thereto, dated November 29, 1951, were introduced in evidence, under the provisions of which his widow, Rosa A. Blasingame, was devised a life estate in the home of the parties and a 1950 Oldsmobile, and the remainder of his property, inventoried at some $37,000, was by separate devises distributed among his church, his step-grandson, and two half-brothers.

The evidence of proponents (the executor, the two half-brothers and the step-grandson, devisees under the will) was to the effect that two days before the wedding, Mr. Blasingame and Mrs. Lovelace came to the office of Mr. Blasingame's attorneys; that they informed the attorney they wanted to have him prepare a marriage contract and the attorney informed them of the effect of such contract and suggested to Mrs. Lovelace that she have an attorney advise her about the matter; that Mrs. Lovelace stated she was marrying Mr. Blasingame not for his property but for the benefit of his companionship; that after a full discussion of the terms of the marriage contract the attorney dictated the contract in their presence and arranged to send a copy of the contract as soon as it was transcribed to Mrs. Lovelace; that that same afternoon a copy of the proposed

contract was delivered to Mrs. Lovelace at her place of business; that the next day both parties came to his office and the attorney asked Mrs. Lovelace if she had read the contract or had any questions and she stated she had read the contract and was ready to sign it; that the contract was then signed by both parties in the presence of the attorney and his partner; that the parties were married the next day; that some six months later Mr. Blasingame came to the attorney's office and gave directions for the preparation of his will, which was prepared according to said directions and was executed by Mr. Blasingame; that about ten months later he added a codicil to said will; that since deceased's death Mrs. Blasingame had had in her possession and used the automobile devised to her in the will and had continued to live in the family home.

On rebuttal Mrs. Blasingame testified that she had sold or given her cosmetic business to her son about a month before the date of the will and that her husband knew all the details of the transaction; she offered testimony, which was refused by the court, as to the value of her cosmetic business which she transferred to her son to show that the statement made by deceased in his will that her business was worth $15,000 was untrue; she denied that a copy of the marriage contract had been delivered to her the day before she signed same.

The court found that no coercion, fraud or deceit was practiced upon Mrs. Blasingame in securing her execution of the antenuptial contract; that she was advised of her legal rights before signing it and that she understood its terms when she signed it; that she was bound by the terms of the contract and her election to take as an heir at law under the statute of descent and distribution instead of under the terms of the will should be denied, and entered judgment accordingly.

The contestant here contends that the evidence shows that the contract was obtained by fraud and overreaching and that the court erred in refusing her proffered testimony as to the value of her cosmetic business, which she disposed of, because such evidence would show that the antenuptial contract was not fair, reasonable and equitable because of the disparity in the amount of property owned by her and by deceased.

Both deceased and Mrs. Blasingame were mature people at the time they decided to get married; both parties had been married before; Mrs. Blasingame had a grown son by her previous marriage and deceased was approximately 75 or 76 years of age; prior to her marriage to deceased the contestant had successfully managed a business for more than thirty years; she does not contend that deceased misled her as to the amount of value of the property which he owned at the time of the marriage; she admits that her prospective husband's attorney advised her to seek legal counsel of her own before signing the antenuptial contract; she does not deny that the legal effect was explained to her before she signed it; she admits she knew she was signing a marriage contract, but contends that she did not read it before signing. What disposition she may have made of her property after signing the contract and after marriage can have no bearing on whether she was induced to sign the contract through fraud or coercion.

Our statute, 84 O.S.1951 § 44, specifically recognizes antenuptial contracts and this court has upheld such contracts many times. See In re Blayde's Estate, 202 Okl. 558, 216 P.2d 277; Leonard v. Prentice, 171 Okl. 522, 43 P.2d 776. As with any other contract, there must be a meeting of the minds of the parties and no fraud, coercion, or deceit can be practiced. Fraud is never presumed but must be established by clear, satisfactory, and convincing evidence. Farmers Union Co-operative Royalty Co. v. Southward, 183 Okl. 402, 82 P.2d 819. Contestant's evidence on the point does not meet this test. The judgment of the trial court that no coercion, fraud or deceit was practiced on contestant in securing the execution of the antenuptial contract is not clearly against the weight of the evidence. Contestant is therefore bound by the terms of the contract under which deceased was given the right to dispose of his property as he saw fit.

Affirmed.