635 P.2d 1333 (1981)
In the Matter of the ESTATE of Robert E. BAGGERLEY, Deceased.
Jobyna BAGGERLEY, Appellee,
v.
Barbara Jayne SIMMONS, Executrix, Appellant.
No. 53488.
Court of Appeals of Oklahoma, Division No. 2.
July 21, 1981.
Rehearing Denied October 5, 1981.
Certiorari Denied October 5, 1981.
Released for Publication October 9, 1981.
Phil E. Daugherty, David C. Matthews, Ames, Daugherty, Black, Ashabranner, Rogers & Fowler, Oklahoma City, for appellee.
Stephen P. Friot, Spradling, Stagner, Alpern & Friot, Oklahoma City, and C. Max Speegle, Edmond, for appellant.
Released for Publication by Order of Court of Appeals October 9, 1981.
BRIGHTMIRE, Judge.
The primary question is whether or not the circumstances surrounding the execution of an antenuptial agreement by Robert E. Baggerley and Jobyna Lawson justify the trial court's finding that a fraud was perpetrated on Lawson thus voiding the pact. We hold they do not and reverse.

I
Lawson, now 55-years-old, divorced her first husband in 1960 after 16 years of marriage. In July, 1963, she met Baggerley, a partner in the family-owned Baggerley Funeral Home located in Edmond, Oklahoma. They began dating. In November, 1963, they discussed the possibility of getting married, eventually decided to do so, and set the wedding date for December 30, 1963.
Shortly before this, Baggerley, a widower and father of the executrix, Barbara Simmons, had his attorney prepare the antenuptial contract in question. The instrument recites it was signed on December 28, 1963. Lawson testified, however, that it was presented to her for her signature at the time the marriage license was obtained during the morning of December 30, 1963.[1] *1334 According to Lawson, the agreement was first mentioned by Baggerley in the court clerk's office where the couple had met to pick up the marriage license. She said her betrothed presented the contract to her and she asked him what it was. "It's just something that people entering in second marriages usually sign," she quoted him as saying. "I told him I had never heard of that before."
The woman went on to say she "didn't like the sound of it" because, she said, "I didn't look on our marriage as business, and that seemed like something businesslike." She said she asked no questions about the agreement and signed it because "[h]e expected me to." She was given an opportunity to read the contract and she said she "glanced at it... . It just seemed cold," she added. "I wanted our marriage to be on trust, and not be according to the contract." And, she said, "[t]he thought entered my mind" not to marry Baggerley. But at last, she decided to go ahead and sign the contract and marry him. On December 30, 1963, she acknowledged to a deputy court clerk "that she executed the [contract] as her free and voluntary act and deed for the uses and purposes therein set forth."
After the license was obtained she said they left the Nobel County courthouse and headed for a Presbyterian church where they visited with her minister for about an hour. Again she mentioned nothing to Baggerley or to her preacher about the contract. This was around noon. After this, she went home where she remained for the rest of the afternoon. There is no evidence that she called anyone to discuss the agreement.
That evening, at about 1900 hours, the two people were married.
"Two or three days" later, she said, he gave her a copy of the agreement. There is no evidence that she ever complained about any of its contents while the man was alive.
Baggerley died in September, 1978, leaving a will he had executed in July, 1978. In it he bequeathed to his wife: "(a) Our home ... [in] Edmond, Oklahoma (b) The right to live in my house [located at another address] as long as she desires or until her death or remarriage ...; (c) An annual cash income of $12,000.00 per year, to be paid from the Trust hereinafter created." He gave his interest in the funeral home to a trustee for the use and benefit of his wife and to pay his wife $12,000 annually out of its profits. He gave his three grandchildren $50,000 each and gave the residue of his estate to his daughter.
The trial court, upon the basis of this evidence, made certain findings in accord with the testimony of Lawson  saying they were "not in dispute"  and concluded as a matter of law that the "timing and circumstances of the presentation" and Baggerley's "failure to make a proper disclosure" of his property in the contract "constituted a fraud on Jobyna Baggerley and render[ed] *1335 the antenuptial contract null and void."

II
The threshold question, then, is whether the trial judge's finding of fraud and his legal conclusion that the contract is void are warranted by the record. We hold they are not.
Lawson's request for judicial voiding of the contract is predicated on four specific grounds: (1) it was not signed by her "freely, understandingly and without fraud ..."; (2) it "did not completely disclose the assets of Robert E. Baggerley ..."; (3) Lawson "is now totally disabled ..."; and (4) her signature "was unfairly obtained" because the agreement was not presented soon enough and its contents not explained to her.
The law favors written antenuptial contracts[2] and makes the inheritance rights of a spouse subservient to them.[3] Of the four grounds relied upon by Lawson for vitiating the agreement, the only one the law recognizes is fraud.[4] And fraud is never presumed but must be established by clear, satisfactory, and convincing evidence.[5] Lawson's evidence will not support a finding of fraud.[6]
The facts in Leonard v. Prentice, 171 Okl. 522, 43 P.2d 776 (1935), are remarkably similar to those we have here. There the facts were that an intelligent 42-year-old, previously married woman executed an antenuptial contract a few minutes before marrying a 62-year-old, previously married man. A few days later the man executed a will to which he attached the contract and, after providing the woman with a home and some support, directed the agreement's provisions be carried out. Thirteen years later, the man died and the woman contested the will in an effort to have the contract rescinded on the ground "she executed the contract in haste one or two minutes before the marriage ceremony, did not read it, and did not know the value or extent of the husband's estate ... ." But, said the court, such ground "is not sufficient to impeach the contract." And, continued the court, "[w]hile good faith should always characterize the preparation and execution of an antenuptial contract, ... when written instruments affecting property rights have been voluntarily executed and the lips of one of the parties to it have been sealed by death, the other party may not be permitted to testify that such contract should have contained different language or different provisions."
In the instant case the operative facts at the time the contract was executed are that Lawson was an intelligent 37-year-old woman who once served a Nobel County judge as secretary  a job that required her to occasionally take and transcribe testimony. Baggerley was an older man whose grown daughter was about to bear the first of three grandchildren. Lawson knew at the time she signed the agreement that Baggerley was a well-respected businessman of means in Edmond; that he and his father were partners in the funeral home business; that he was planning to build a new funeral facility; and that he was an only child and stood to inherit the family estate.
Whether the parties discussed the antenuptial agreement anytime before December 30, 1963, cannot be known with certainty. Lawson, of course, says they did not, but this self-serving statement must be viewed with suspicion since Baggerley is no longer able to affirm or deny it. There is not one word in the record that suggests Baggerley was unscrupulous or the type of man who would take unfair advantage of a woman he intended to marry. Indeed, the more likely fact is that the antenuptial pact was aimed at achieving a natural and entirely *1336 appropriate end  the protection of the inheritance rights of his daughter and grandchildren. As we view the contract and his will, the deceased sought to provide for Lawson's needs as well as to protect his daughter's interests. Though Lawson did not receive all she wanted, we think that what she did receive is not unreasonable.
We hold the antenuptial contract was voluntarily executed by Lawson, its terms are reasonable and it is enforceably valid. The judgment of the trial court is, therefore, reversed and the cause is remanded with instructions to proceed with the probate of decedent's will and to distribute Baggerley's estate according to its terms.
BACON, P.J., and BOYDSTON, J., concur.
NOTES
[1] The document consists of five legal size typewritten pages. The top of the first page bears the caption "Antenuptial Contract" in full capital letters.

It begins by reciting that the parties intend to marry; that the first party, Baggerley, is a widower owning property real, personal and mixed; that the second party, Lawson, is unmarried and has property real, personal and mixed; that it is the desire of both parties that each shall retain all or certain of the property now respectively owned by each under separate ownership.
The agreement then provides that second party shall have no right, title or interest in any of the first party's property "to-wit:
"(a) Baggerley Funeral Home ...;
"(b) Series E Government Bonds with a face value of $8,000.00;
"(c) $75,000.00 in cash on deposit in various banks...;
"(d) All real estate ...;
"(e) All property which First Party shall inherit from his parents ... ."
Next the agreement provides that the first party may exercise exclusive control over the property and that second party waives the inheritance rights she would otherwise have under 84 O.S. 1961 § 44.
This is followed by similar provisions for the Lawson property. It was agreed that first party shall have no interest in any of second party's property, to-wit:
"(a) $5,000.00 in cash on deposit in various banks...;
"(b) All real estate ...;
"(c) All property which Second Party shall inherit from her parents ... ."
The agreement went on to say that first party agrees that second party may exercise exclusive control over her property and that he waives the inheritance rights he would otherwise have under 84 O.S. 1961 § 44 with respect to second party's property.
The document further recites that "the parties hereto declare that this antenuptial agreement is made and accepted by each of said parties freely and voluntarily and without coercion, undue influence or duress, after having informed themselves of its meaning and contents."
Finally, the instrument says the parties signed it "in duplicate this 28th day of December, 1963."
[2] Blasingame v. Gathright, Okl., 284 P.2d 431 (1955).
[3] 84 O.S. 1971 § 44; Washington and Lee University v. District Ct., Okl., 492 P.2d 320 (1971), cert. dismissed, 406 U.S. 951, 92 S.Ct. 2061, 32 L.Ed.2d 351 (1972).
[4] 15 O.S. 1971 § 233; Blasingame v. Gathright, 284 P.2d at 433.
[5] Blasingame v. Gathright, 284 P.2d at 433.
[6] Leonard v. Prentice, 171 Okl. 522, 43 P.2d 776 (1935).