In the Matter of the ESTATE OF Yahola BURGESS, Deceased.

No. 55309.

Court of Appeals of Oklahoma, Division No. 1.

April 20, 1982.

Rehearing Denied May 11, 1982.

Certiorari Denied June 15, 1982.

Released for Publication by Order of the Court of Appeals June 18, 1982.

Jay C. Baker, Tulsa, for appellants, Wynema L. Capps and Marcella S. Giles; Stuart S. Malawer, Alan M. Winterhalter, McLean, Va., of counsel and on brief.

Scott T. Knowles, Ray H. Wilburn, Tulsa, for appellee, Gladys Cain Burgess.

WILSON, Presiding Judge:

At issue in this case is the enforceability of an antenuptial contract between Yahola Burgess and Gladys Cain Burgess. The couple agreed before their marriage that neither would lay claim to the other's property in the event of divorce or death. Nevertheless, after Mr. Burgess' intestate death, a dispute arose in probate court between Mrs. Burgess, who sought to have the antenuptial contract invalidated, and Wynema Capps and Marcella Giles, Mr. Burgess' grown daughters of a previous marriage and the administratrices of his estate.

The trial court, to the daughters' chagrin, set aside the contract, and thus Mrs. Burgess was granted her statutory share in the estate under 84 O.S.1971, § 213 as well as homestead rights and a widow's allowance. The daughters now appeal, challenging the trial court's finding that the antenuptial agreement was invalid. Though not quibbling over the homestead rights and widow's allowance, they do contend that Mrs. Burgess' contract waiver of rights in Mr. Burgess' property was valid and binding and should have been enforced to bar her claim to a share of the estate under the law of intestate descent and distribution.

## I. THE FACTS

Yahola Burgess and Gladys Cain, having enjoyed a companionable courtship of some eighteen months, decided to tie the knot in 1971. They had a lot in common. Both were in their fifties, he fifty-seven and she fifty-three. Both liked to ride horses and watch football games. Both had been through divorces; this would be his third marriage, her second. Both had grown children from their previous marriages. And, both had some property, though his holdings, consisting of 35 acres of family land on the far outskirts of Tulsa and a little rental property, were substantially greater than hers, consisting of a house in Tulsa.

Mr. Burgess, made circumspect by his prior experience in divorce court and evidently desirous of protecting his land for his own sake and that of his daughters, proposed an antenuptial contract and Mrs. Burgess agreed. Mr. Burgess' lawyer drew up the agreement. The parties executed it in the lawyer's office.

The contract was short and simple. It stated basically:

THAT in consideration of a marriage about to be entered into by and between the parties hereto, it is mutually agreed and understood that neither of the above named parties, by reason of said contemplated marriage, hereafter to be consummated shall have or claim any right, title or interest in or to the property now owned by the other, either during their lives or after the death of either.

There then followed two identically-worded paragraphs, one covering her property and one covering his, specifying that inasmuch as each party had children from prior mar-

riages, neither would claim any right in the property of the other during their respective lifetimes or upon their respective deaths, but rather that each would manage and retain his or her own property "with full power and authority to sell, convey or dispose of [his or her] own property by will or otherwise, as [he or she] may see proper."

The wedding took place two weeks after the agreement was executed. Mrs. Burgess, who had sold her Tulsa home and put the proceeds into a certificate of deposit in her name, took her furniture and went to live in Mr. Burgess' house on his 35-acre tract. She continued working at her job as a secretary for an insurance company for several years, retiring in 1978. Mr. Burgess, a tool grinder by trade, was prevented by ill health from working full time, but he did a little road work for the county.

Mr. Burgess died without a will in 1978, leaving his widow and daughters as next of kin. Seven years earlier, when the parties were discussing the antenuptial contract before the marriage, there had been talk to the effect that the agreement could be changed if the union worked out well, but in fact it never had been modified or revoked. Regardless, Mrs. Burgess asserted a claim to Mr. Burgess' property in probate court, and hence arose this dispute between her and Mr. Burgess' daughters.

## II. GENERAL RULES, PRINCIPLES, POLICIES, AND FACTORS

Antenuptial contracts, by which engaged couples waive rights to each other's separate property or in other ways alter the incidents of marriage that would otherwise attach, are well-recognized in Oklahoma, both by statute and by court decision. 84 O.S.1971, § 44; *Freeman v. Freeman*, 565 P.2d 365 (1977); *Talley v. Harris*, 199 Okl. 47, 182 P.2d 765 (1947); *In re Cole's Estate*, 85 Okl. 69, 205 P. 172 (1922). Long resorted to by the rich as a means of controlling property, such contracts are being used more and more by ordinary modern couples. They are particularly suited to the needs of couples who are older, who have been married before, who have their individual families to think of, or who have built up property of their own over which they wish to retain control after the wedding. *See,* Gamble, "The Antenuptial Contract," 26 Miami L.Rev. 692 (1972) for a survey demonstrating these circumstances.

It is often said that antenuptial contracts are enforceable so long as they are "fair," "just," and "reasonable." *Matter of Estate of Cobb*, 305 P.2d 1028 (1956); *Thomas v. Dancer*, 264 P.2d 714 (1953); *Talley v. Harris, supra.* It is also said that they are favored by the law. *Leonard v. Prentice*, 171 Okl. 522, 43 P.2d 776 (1935).

In practice, however, courts have tended to be rather more exacting of such contracts than of other contracts. At the root of this tendency seems to lie an attitude of paternalism toward women. For example, coming down on the side of a widow in *Estate of Duncan*, 87 Colo. 149, 285 P. 757 (1930), the Court labeled an antenuptial contract "a wicked device to evade the laws applicable to marriage relations, property rights, and divorces," which was "clearly against public policy and decency," and an attempt by the husband to "legalize prostitution, under the name of marriage." In 1922, our own Court wrote in *Cole's Estate, supra:*

> What person so exposed to imposition as a woman, contracting personally with her intended husband, just on the eve of marriage, at a time when all prudential considerations are likely to be merged in a confiding attachment, or suppressed from an honorable instinct and sentiment of delicacy?

Well-intentioned though this chivalrous attitude may have been in the past, times have changed. It will no longer do for courts to look on women who are about to be married as if they were insensible ninnies, pathetically vulnerable to overreaching by their fiancés and in need of special judicial protection. *See, Potter v. Collin*, 321 So.2d 128 (Fla.App.1975).

Moreover, there are today many policy reasons favoring the enforcement of antenuptial agreements. These contracts can be seen as fostering marriage since some

couples, especially older ones who typically already have families and property of their own, might choose not to marry absent assurance that they will still be free to order their affairs as they wish. An antenuptial contract can accomplish this goal and therefore facilitate the marriage, but only if a couple who depends on one can feel confident their contract will be upheld in court.

Another ground for favoring antenuptial contracts is that, ideally, both partners' knowing up front how the other's property is going to be disposed of may prevent future disputes over the matter. Such agreements might even serve to avoid the marital conflict sometimes occasioned by interference, well-meaning or otherwise, from the parties' children or other meddlesome relatives.

With these general policies as a framework, we turn to the specific rules and factors traditionally applied in testing the validity of antenuptial agreements.

 The enforceability of any antenuptial contract depends, of course, on its own language and the particular facts and circumstances surrounding it. As in other contract cases, the object is to follow the intent of the parties. Like other contracts, antenuptial agreements must be supported by consideration, though the marriage itself will ordinarily suffice to meet this requirement unless the circumstances dictate otherwise. For a thorough treatment of these and many other topics, *see* 2 A. Lindey, *Separation Agreements and Antenuptial Contracts*, 90–1, 2 (1978 and 1981 Supplement).

 And, like other contracts, antenuptial contracts can be avoided by a showing of fraud, duress, coercion, overreaching, and the like. It is settled, though, that fraud is never presumed, and the party attacking the contract's validity must prove it. Furthermore, the proof of fraud must rise to the standard of "clear and convinc-

ing" evidence. *Blasingame v. Gathright*, Okl., 284 P.2d 431 (1955). Thus, upholding an antenuptial contract in *Leonard v. Prentice, supra*, the Oklahoma Supreme Court held:

> The testimony of the wife, given in an action filed by her to set aside the contract over 13 years after the consummation of the marriage and after the death of the husband, that she executed the contract in haste one or two minutes before the marriage ceremony, did not read the contract, and did not know the value and extent of the husband's estate, is not sufficient to impeach the contract.

 Other general rules govern which marital rights can and which cannot be waived by antenuptial agreements. It has been held in Oklahoma that homestead rights cannot by waived. *Cole's Estate, supra*. The same goes for the statutory widow's or family allowance during the administration of an estate. *In re Rossiter's Estate*, 191 Okl. 342, 129 P.2d 856 (1942).[1] On the other hand, among the rights which may be waived by antenuptial contract is the right to inherit under the statute governing intestate succession. 84 O.S.1971, § 213; *Cobb's Estate, supra.*

Certain tests, peculiar to antenuptial agreements, have been cited in considering their validity. As summarized in an excellent recent law review note—Stamets, "Husband and Wife: Drafting an Antenuptial Contract in Oklahoma," 32 Okl.L.Rev. 220, 228 (1979)—these issues are:

1. Is fair and reasonable provision made for the [party opposing the contract]?
2. If not, was a full, fair, and frank disclosure of the [other spouse's] worth made before execution of the contract?
3. If neither of the above, did the [party challenging the contract] in fact have a generally accurate knowledge of [the other's] worth?

Lindey on *Separation Agreements and Ante-nuptial Contracts, supra*, at p. 90–28 *et seq.* lists and discusses eight factors for

---

**1.** These rules are not universal and may be due for reassessment, but as they are not challenged in the instant appeal, we will not examine them here. *See generally*, Annot., 30 A.L. R.3d 858 (1970).

use in considering the validity of such contracts:

(a) The cognizability generally of such agreements in the specific jurisdiction;

(b) The purpose sought to be achieved thereby;

(c) The existence of a legal impediment to the establishment of a valid marriage;

(d) The relevance of the agreement to a particular marriage;

(e) Adequacy of consideration, or in the alternative, full and fair disclosure;

(f) The form of the agreement;

(g) Reality of consent; or

(h) The competency of the parties.

These, then, are some of the general rules, principles, policies, and factors for our guidance in determining whether, under the facts and circumstances of the present case, the trial court erred in setting aside the contract between Yahola Burgess and Gladys Cain Burgess.

### III. APPLICATION TO THE CASE AT BAR

 Here, the contract at issue does not make "fair and reasonable" provision for either spouse. It simply says that what is his is his and what is hers is hers and so it shall remain despite the marriage. It is true that he had more property than she did, but we do not believe this disparity made the agreement inherently unfair, or that it rendered the agreement invalid for lack of consideration. The marriage itself was sufficient consideration, especially when coupled with the fact that both parties, not just the bride, waived the right to claim the other's property.

 Neither do we believe this contract was the result of fraud, duress, coercion, or overreaching. There is nothing in the record to indicate that it was, muchless the "clear and convincing" evidence required under the case-law discussed above. Mrs. Burgess testified she did not really understand what she was signing, but like the Court in the Leonard case, supra, we conclude such testimony alone is insufficient to establish fraud. Besides, other evidence,

including Mrs. Burgess' statements to her step-daughters, illustrates that she did understand and concur in the agreement.

As for whether Mr. Burgess made full disclosure of his holdings, no disclosure was recited in the contract itself, and the testimony on this point was conflicting. But even assuming a lack of specific disclosure, the next issue is whether Mrs. Burgess had a generally accurate knowledge of Mr. Burgess' worth.

On this point, we must agree with the appellant daughters that the evidence established Mrs. Burgess did have this knowledge, and that a finding to the contrary is clearly against the weight of the evidence.

Gladys Cain had known Yahola Burgess for some time. She knew about the rental property because they had discussed the problems that come up with tenants. She had ridden over the 35-acre tract of land with him on horseback, and she knew some of the history behind these family lands, which were divided and occupied by several members of the clan. She did testify she did not know before the marriage exactly where one of the Burgess' portion ended and another's began. Nonetheless, we remain convinced that she did have a generally accurate awareness of the extent of her betrothed's property.

Considering the evidence here, we find this case distinguishable from Cobb's Estate, supra, on its facts. There, a nephew of the decedent failed in an attempt to set up a "lost" antenuptial agreement to defeat the claim of his uncle's widow because there was no proof of either provision for the wife, full disclosure, or actual knowledge. In our case, the facts and circumstances were entirely different. Here, there was evidence of generally accurate actual knowledge.

 Accordingly, we hold as did the Florida Court in the well-reasoned decision of Del Vecchio v. Del Vecchio, 143 So.2d 17 (Fla.1962):

Inadequacy of provision for the wife does not in itself vitiate an antenuptial agreement. If, when she signed the con-

tract freely and voluntarily, she had some understanding of her rights and had been fully informed by the husband as to his property or if, notwithstanding the husband's failure to disclose, she had or reasonably should have had a general and approximate knowledge of the character and extent of his property she will be bound.

Additional circumstances are of consequence here as well. For one thing, Mrs. Burgess, far from being a ninny, appears as a mature, intelligent woman who had worked in the business world. *See, Leonard v. Prentice, supra,* upholding a contract "executed by a woman 42 years of age of more than ordinary intelligence." Also, since she does have her homestead, it is not as if she will end homeless and penniless on the sidewalk if this agreement is upheld.

Additionally, we find the policy reasons discussed above persuasive here. After all, the parties were both full adults; they had both been married before and had grown children of their own; they both had some property. The fact that Mr. Burgess was richer than Mrs. Burgess does not seem to us any reason to set aside this freely-entered-into contract and thereby posthumously nullify Mr. Burgess' apparent plan to leave his property to his daughters.

In light of all the facts and circumstances of this case, we conclude that the antenuptial contract between Yahola Burgess and Gladys Cain Burgess was valid and should have been enforced insofar as Mrs. Burgess' assertion of the right to share in the estate under the law of descent and distribution. Because of this conclusion, we do not reach the second issue raised by appellants.

Finally, a commendation is in order for counsel on both sides of this dispute. Their impeccable and extensive research, and their well-organized and ably written arguments, have been of great help to us in deciding this difficult case.

The judgment of the trial court is REVERSED and the case REMANDED for entry of a judgment consistent with this opinion.

REYNOLDS and BOX, JJ., concur.