2004 OK CIV APP 58

**John W. GRIFFIN, Plaintiff/Appellant,**

v.

**Pauline Fullerton Fleetwood GRIFFIN, Defendant/Appellee.**

**No. 98,768.**

Court of Civil Appeals of Oklahoma, Division No. 3.

March 26, 2004.

As Corrected March 29, 2004.

**98**

Joel L. Wohlgemuth, William W. O'Connor, Lindsey E. Albers, Norman, Wohlgemuth, Chandler & Dowdell, Tulsa, OK, and James C. McMillin, Sheryl N. Young, Kymala B. Carrier, McAfee & Taft, Oklahoma City, OK, and Robert Locke, Locke and Moore, Muskogee, OK, For Plaintiff/Appellant.

D.D. Hayes, Hayes Law Office, Muskogee, OK, and J. Philip Adamson, Tulsa, OK, For Defendant/Appellee.

Opinion by LARRY JOPLIN, Judge.

¶ 1 Plaintiff/Appellant John W. Griffin (Husband) seeks review of the trial court's order granting alimony in lieu of property division and support alimony to Defendant/Appellee Pauline Fullerton Fleetwood Griffin (Wife) in the parties' divorce action. In this proceeding, Husband complains the trial court erred in refusing to enforce the parties' antenuptial agreement. Having reviewed the record and argument, we hold the trial court indeed erred. Accordingly, the order of the trial court dividing property and awarding alimony must be reversed, and the cause remanded for entry of an order consistent with the parties' antenuptial agreement.

¶ 2 In anticipation of marriage, the parties agreed to execute an antenuptial agreement. At the time, Husband held an interest in significant trust assets,[1] most of which were placed in trust for him at or soon after his birth. Wife was a college-educated business woman, with experience in the management of retail businesses.

¶ 3 After three weeks of negotiation and the exchange of at least two proposed drafts of the antenuptial agreement, the parties met, accompanied by their respective attorneys, and executed the agreement on February 28, 1991. According to the agreement, each party made financial disclosures and disclaimed any right in the other party's separate property, any income or gain therefrom. The parties also agreed that neither would seek nor be entitled to alimony, support, division of marital assets, costs, attorney fees, or any other money or property from the other, except as provided by the agreement.

¶ 4 The agreement also provided that, in the event of divorce, Husband would pay Wife a lump sum amount according to the length of the marriage. If the divorce occurred after five years but before ten years from the date of marriage, Husband would pay Wife $250,000.00; if divorce occurred after ten years but before fifteen years of marriage, he would pay her $500,000.00; if the divorce occurred after fifteen years of marriage, he would pay her $500,000.00, plus a percentage of his gross salary over a period of four years.

¶ 5 On March 9, 1991, the parties married. Of the marriage, three children were born. During the marriage, Husband worked in the management of the family businesses, and the assets of Husband's trusts appreciated.

¶ 6 Husband commenced the instant action for divorce in May 2000. Wife answered and counter-claimed for divorce, asserting misrepresentations in the antenuptial agreement.

¶ 7 At trial, the parties presented evidence concerning the events surrounding the negotiation and execution of the antenuptial agreement, including a video tape recording of the meeting. The parties also adduced evidence concerning the value of Husband's disclosed assets, in an exhibit to the antenuptial agreement clearly marked "Income Tax Basis," but referred to by Husband's attorney at the time of execution as "fair market value."

¶ 8 Upon consideration of the evidence, by order filed July 3, 2002, the trial court found the antenuptial agreement void and in violation of public policy as impermissibly proscribing a division of jointly acquired property. The trial court also found that the antenuptial agreement was void because of misrepresentations in Husband's financial disclosures. Additionally, the court found that the antenuptial agreement did not make fair and reasonable provision for Wife; that

---

1. Particularly, television stations in Oklahoma and Arkansas, as well as a regionally well-known food service.

Husband did not make full, fair, and frank disclosure of his worth before the execution of the agreement; and that Wife did not have a generally accurate knowledge of his worth at the time the agreement was executed.

¶ 9 The trial court consequently held that Wife was entitled to one-half of the increase in value of the Husband's separate assets attributable to the joint efforts of the parties during the marriage, and awarded Wife alimony in lieu of property division and support alimony. Husband filed a motion for new trial, which the trial court denied.

¶ 10 In this appeal, Husband challenges the trial court's refusal to enforce the parties' antenuptial agreement, and the awards of alimony in lieu of division of property, support alimony and attorney's fees to Wife.[2] We review the trial court's decision concerning enforcement of an antenuptial agreement under the traditional, clear-weight-of-the-evidence standard applicable in equity actions. *In re Cobb's Estate*, 1956 OK 299, ¶ 21, 305 P.2d 1028, 1033.

### PUBLIC POLICY

¶ 11 The trial court held "the antenuptial agreement violates public policy and is void insofar as it seeks to prohibit [Wife] from being awarded an equitable division of the property acquired by the parties during marriage as a result of the joint efforts of the parties." In *Taylor v. Taylor*, 1991 OK CIV APP 126, 832 P.2d 429, the Court of Appeals held an antenuptial agreement, divesting wife of a share in the increased value of the marital estate attributable to joint efforts, void as against the public policy expressed by 43 O.S. Supp.1989 § 121. The year following the decision in *Taylor*, the Oklahoma Legislature amended § 121 to permit the waiver of the right to an equitable division of jointly acquired property by antenuptial agreement. See, 43 O.S. Supp.1992 § 121 (eff. September 1, 1992).[3] Consequently, there is no public policy bar to enforcement of the parties' antenuptial agreement, and the trial court erred in so holding.

### BURDEN OF PROOF

¶ 12 Like most issues in this case, the parties do not agree on the allocation of the burden of proof. Wife asserts that the proponent of the antenuptial agreement bears the burden to demonstrate a full, fair and frank disclosure of the amount, character and value of the property was made. *In re Cobb's Estate*, 1956 OK 299, ¶ 16, 305 P.2d at 1032. Husband argues that because Wife seeks to avoid enforcement of the antenuptial agreement for misrepresentation, "[i]t is settled ... that fraud is never presumed, and the party attacking the contract's validity must prove it [and] the proof of fraud must rise to the standard of 'clear and convincing' evidence." *Matter of Burgess' Estate*, 1982 OK CIV APP 22, ¶ 17, 646 P.2d 623, 626. The "burden [rests] upon [wife] to prove by satisfactory testimony her claim that [antenuptial agreement] was procured by fraud or duress." *Leonard v. Prentice*, 1935 OK 427, ¶ 5, 43 P.2d 776, 778.

¶ 13 The confusion concerning burden of proof arises primarily because antenuptial agreements, like contracts in general, "can be avoided by a showing of fraud, duress, coercion, overreaching, and the like." *Burgess*, 1982 OK CIV APP 22, ¶ 16, 646 P.2d at 626. However, an antenuptial agreement is a special kind of contract: " 'The *confidential relationship* which generally, al-

---

2. In the decree of divorce, the trial court awarded Wife custody of the children and ordered Husband to pay child support. According to Husband's brief, however, the trial court later modified its custody order, granting custody of the children to him "on evidence of [Wife's] continued use of illegal drugs, medical neglect of the ... children, cohabitation with a convicted felon, prolonged absences from the homestead where the children resided, and forgery of medical and school records." Therefore, child custody is no longer an issue on appeal.

3. "..... As to such property, whether real or personal, which has been acquired by the parties jointly during their marriage, whether the title thereto be in either or both of said parties, the court shall, *subject to a valid antenuptial contract in writing*, make such division between the parties as may appear just and reasonable, by a division of the property in kind, or by setting the same apart to one of the parties, and requiring the other thereof to be paid such sum as may be just and proper to effect a fair and just division thereof. ...." (Emphasis added.)

though not always, is deemed to exist between a prospective husband and wife requires the utmost good faith and a high degree of fairness.'" *In re Cobb's Estate,* 1956 OK 299, ¶ 15, 305 P.2d at 1032. (Emphasis added.) Because of the special nature of the relationship between a prospective husband and wife, the law imposes an additional burden upon the proponent of an antenuptial agreement to show either a "fair and reasonable provision made for the party opposing the contract," *or,* a "a full, fair, and frank disclosure of the other spouse's worth made before execution of the contract," *or,* "[i]f neither of the above, [that] the party challenging the contract in fact ha[d] a generally accurate knowledge of the other's worth." *Burgess,* 1982 OK CIV APP 22, ¶ 19, 646 P.2d at 626.

¶ 14 In allocating the burden of proof, the court should first look to the agreement itself. If the antenuptial agreement is "apparently unfair on its face, equity raises a presumption against the validity thereof, and casts the burden upon ... those claiming the validity of the contract to show that a full and fair disclosure was made to [the other party] of the extent and value of the property before [the other party] signed it, or that [the other party] was aware to all intents and purposes of the nature, character and value of the estate which she was relinquishing if the marriage took place." *In re Cobb's Estate,* 1956 OK 299, ¶ 16, 305 P.2d at 1031–1032. (Citations omitted.) However:

> If an agreement provides that full disclosure has been made, a presumption of full disclosure arises. If a spouse attempts to rebut this presumption through an assertion of fraud or misrepresentation then this presumption can be rebutted if it is proven by clear and convincing evidence.

*Porreco v. Porreco,* 571 Pa. 61, 811 A.2d 566, 570 (2002).

¶ 15 In the present case, the antenuptial agreement recites that a full disclosure of all real and personal property had been made, and that both parties had reviewed, examined and understood the agreement and attached exhibits. Independent counsel for each party executed an "attorney's acknowledgment" in which both verified that the legal effect of the agreement was explained to their clients. This gave rise to a presumption of full disclosure, and consequently, validity of the antenuptial agreement. Since Wife attacked validity and enforcement of the antenuptial agreement on the basis of Husband's alleged misrepresentation, the law cast on her the burden of proving misrepresentation by clear and convincing evidence. The trial court placed the burden of proving validity on Husband, but did not require Wife to prove misrepresentation by clear and convincing evidence.

## MISREPRESENTATION

¶ 16 Wife argues that although Husband purported to make a full, fair and frank disclosure of his assets and their value, he in fact misrepresented the existence and value of his assets in basically two ways. First, even though the agreement valued the assets at "income tax basis," his attorney represented the value of the assets at the execution of the agreement to be at "fair market value." Second, says Wife, Husband failed to disclose a beneficial interest in his deceased father's trust.

¶ 17 Before reviewing these allegations specifically, it is important to remember that fraud is never presumed, and must be proven by clear and convincing evidence. Unlike some other types of contracts, antenuptial agreements are favored in the law. *Leonard,* 1935 OK 427, ¶ 17, 43 P.2d at 780. The law favors these agreements as fostering marriage, since couples might choose not to marry without assurances that they will be free to order their affairs as they wish. *Burgess,* 1982 OK CIV APP 22, ¶ 9, 646 P.2d at 625.

¶ 18 Consequently, courts rarely set aside antenuptial agreements for fraud and misrepresentation. For example, in *Leonard:*

> ... The testimony of the wife, given in an action filed by her to set aside the contract over 13 years after the consummation of the marriage and after the death of the husband, that she executed the contract in haste one or two minutes before the marriage ceremony, did not read the contract, and did not know the value and extent of

the husband's estate, is not sufficient to impeach the contract. 43 P.2d 776, 1935 OK 427, ¶ 0(1). Indeed, "in *Hoard v. Jones,* 119 Kan. 138, 237 P. 888, 894 [it was held]: 'The fact that the plaintiff was unable to read, or that it is not affirmatively shown that the contract was read to her at the time she executed it, do not in themselves indicate fraud[,] . . . its voluntary execution being admitted.' " *Leonard,* 1935 OK 427, ¶ 8, 43 P.2d at 779.

¶ 19 In *Blasingame v. Gathright,* 1955 OK 152, 284 P.2d 431, the court found no fraud or deceit even though wife testified that the values listed in the antenuptial agreement were approximate, and that she neither read nor knew its contents before she signed it. In *Matter of Baggerley's Estate,* 1981 OK CIV APP 49, 635 P.2d 1333, the Court of Appeals reversed the trial court's finding of fraud sufficient to void an antenuptial agreement, where wife testified she signed the agreement, but had only "glanced at it," and husband had not made "a proper disclosure" of his property, holding wife had a general knowledge of husband's worth:

> . . . [Wife] knew at the time she signed the agreement that [husband] was a well-respected businessman of means in Edmond; that he and his father were partners in the funeral home business; that he was planning to build a new funeral facility; and that he was an only child and stood to inherit the family estate.

1981 OK CIV APP 49, ¶ 14, 635 P.2d at 1335. These cases clearly demonstrate the courts' reticence to set aside an antenuptial agreement except in the *extremely rare* circumstance of clearly and convincingly proven fraud or misrepresentation.

### VALUE

¶ 20 On this issue of misrepresentation, Wife's expert testified the "fair market value" of Husband's listed assets was $4.6 million,[4] rather than the $2.5 million "income tax basis" represented in Exhibit A to the ante-

nuptial agreement. The trial court considered this a material misrepresentation, finding:

> . . . [Husband's] *attorney* represented to [Wife] and her attorney that the schedule of [his] assets attached to the agreement set forth fair market value of the assets of $2,500,000. At trial the evidence was undisputed that the value of [Husband's] premarital assets attached to the antenuptial agreement was not based on fair market value, but instead was based on what [Husband] refers to as tax value. . . . . [T]here is a huge difference between tax value, book value and fair market value. . . .

(Emphasis added.)

¶ 21 Exhibit A consisted of two pages purporting to be a complete list of assets known to Husband.[5] At the top of both pages of Exhibit A—in bold type—appeared the title:

### STATEMENT OF ASSETS AND LIABILITIES—INCOME TAX BASIS

### JOHN W. GRIFFIN TRUST

Included in the financial statement were values attributed to all the assets and liabilities. This exhibit was given to Wife at least three weeks before execution for her examination and she had the advice of an independent attorney of her own choosing to aid her in that examination. During this time, even though the values listed were clearly on an "income tax basis," neither Wife nor her attorney raised any question concerning the method of valuation or the stated values. Obviously, as the trial court found, it was undisputed that these values were on an "income tax basis." The assets were valued on this basis, as Husband's expert explained, because of the extreme difficulty in valuing assets of closely-held corporations such as those of Husband's family businesses. Even Wife's expert agreed it is difficult to arrive at a fair market value of a closely held corporation.

---

4.  He arrived at this figure relying in part on a $20 million appraisal of the family-owned TV stations done a month after the execution of the antenuptial agreement, multiplied by Husband's seven percent (7%) ownership interest.

5.  Also attached to the antenuptial agreement was a copy of Husband's 1989 tax return.

¶ 22 Since the agreement made clear that the assets were valued on income tax basis, Wife argues it was Husband's attorney who misrepresented the valuation as "fair market value" at the execution of the antenuptial agreement.[6] In order for Wife to prove by clear and convincing evidence that these statements of the attorney constitute misrepresentation sufficient to invalidate the contract:

> .... It is well-settled hornbook law, universal in scope, that false representations which will invalidate a contract must be such as to constitute actual or legal fraud, and indispensable elements of such fraud are (1) that the representations must have been material to the contract or transaction at the time they were made; (2) the misrepresented facts must be facts of which the victim is ignorant, and which a person of ordinary sagacity and diligence would have acquired no knowledge; (3) *the misrepresentations must be well calculated to deceive, and to induce the victim to make the contract; and* (4) *they must have induced him to do so.*

*James Talcott, Inc. v. Finley,* 1964 OK 48, ¶ 11, 389 P.2d 988, 992–993. (Emphasis added.)

¶ 23 The statements by Husband's attorney did not, and could not, rise to the level of fraudulent misrepresentation. There was no testimony or *evidence of any kind* suggesting that these statements by the attorney were "well calculated to deceive and to induce [her] to make the contract." Equally important, Wife never testified *she relied* on the attorney's statements of "fair market val-

ue," or that she was induced to sign the agreement based on these statements.

¶ 24 Moreover, the evidence is clear that there was no reliance on the attorney's statements. Otherwise, Wife would have arrived at the execution with no intent to sign the agreement *until* Husband's attorney represented the values to be "fair market" value, and then, based on that representation, decided to sign. In fact, it is clear from the videotaped meeting that the attorney's statements did not induce Wife to sign the agreement.[7] More damaging still to the misrepresentation allegation is the fact that Wife acknowledged and agreed to the attorney's statements that "the fair market value set forth opposite the assets of [Husband] are based upon *estimates,* [and] that *reasonable minds can differ* as to the amount of fair market value."

¶ 25 The attorney's statements regarding fair market value come closer to a statement of opinion than statements "well calculated to deceive." When coupled with the reminder that "reasonable minds can differ" as to value, it would be unreasonable to believe that the statements were made with the intent to deceive.[8] In short, absent evidence of intent to deceive, and reliance on those statements, Wife's allegations of misrepresentation by Husband's attorney are wholly unsupported, and the trial court erred in refusing to enforce the antenuptial agreement on this basis.

## UNDISCLOSED ASSETS

¶ 26 Wife also alleged Husband failed to disclose his one-half beneficial interest in

---

6. Husband's attorney referred to "fair market value" four times while reviewing the agreement with Wife:

   HUSBAND'S ATTORNEY: Attached to this Antenuptial Agreement as Exhibit A are several pages of financial statements, setting forth a description and an estimate of the *fair market values* of the assets owned by [Husband] as of January 31, 1991. Have you reviewed these financial statements?

   WIFE: Yes.

   ....

   HUSBAND'S ATTORNEY: Do you acknowledge and agree that the *fair market value* set forth opposite the assets of [Husband] are based upon estimates, *that reasonable minds can differ as to the amount of fair market value,* and that

you consider that there has been a full disclosure as to the nature and *fair market value* of the assets of [Husband] for the purposes of this agreement?

   WIFE: Yes.

   (Emphasis added.)

7. Wife stated, "I'm marrying him because I love him."

8. See also, 15 O.S. § 137 ("The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter, which preceded or accompanied the execution of the instrument.")

his deceased father's trust, resulting in the understatement of his assets by $7.5 million.[9] Husband argues that his deceased father's trust—the John T. Griffin Revocable Trust—was a "Q–Tip" trust, with his mother to receive the income during her lifetime. His interest was a contingent remainder, requiring that he survive his mother in order to take under the trust, and that at her death, the assets of the trust would pass to him and his brother in equal shares.[10]

¶ 27 In addition to Exhibit A, there was attached to the antenuptial agreement, Exhibit E, *initialed by Wife at the time of execution,* titled "Statement of Expectancy." This statement set forth Husband's "expectancy to receive from my mother's estate upon her death, 50% of the value of all her assets; and that as of the date of the antenuptial agreement to which this statement is attached, the estimated net worth of my mother is $25,000,000.00." Even assuming a failure to disclose whatever *beneficial* interest Husband had in his father's trust, this exhibit clearly expresses his expectancy to receive 50% of the assets at his mother's death worth $12.5 million, far exceeding Wife's expert's calculated value of the trust at $7.5 million.

¶ 28 Similarly fatal to this misrepresentation claim is Wife's acknowledgment that the financial statements were based on Husband's knowledge and belief, that they set forth a detailed description of Husband's assets, "but that it is possible that there could be assets of which [Husband] has no knowledge or has overlooked, and which [were] not included in the exhibit[s] attached to the antenuptial agreement."

¶ 29 The disclosure of the "expectancy interest," coupled with Wife's acknowledgment that conceivably some assets were not disclosed, make clear the lack of a fraudulent intent to deceive. The trial court erred in refusing to enforce the antenuptial agreement on this basis.

## BURGESS TEST

¶ 30 Even though an antenuptial agreement may be free of fraud or misrepresentation, a court will refuse to enforce the agreement unless the agreement meets one or more of the *Burgess* factors. The *Burgess* factors are expressed in the disjunctive, so that in the event the agreement meets any one of the three criteria, the agreement will be enforced.[11]

## FAIR PROVISION FOR WIFE

■ ¶ 31 After rejecting two proposed drafts, and negotiating for larger payments in the event of divorce, Wife agreed to the listed schedule of payments in the antenuptial agreement. Given her business background, the advice of her independent attorney, the negotiations on this very point, and her acceptance of the agreement as written, it appears that a fair provision was made for Wife.

## FULL DISCLOSURE

¶ 32 Wife argues that the fair market value of the assets listed, coupled with the non-disclosure of the beneficial interest in the trust, means the value of Husband's assets was actually between $9 million and $11.5 million. So, says Wife, since Husband only disclosed $2.5 million in Exhibit A, there was no full disclosure of his property and assets as required by law. Husband responds, pointing out that the agreement disclosed his assets on an income tax basis, *and* his expectancy to inherit $12.5 million after his mother's death, for a total disclosure of $15 million.

---

9. Wife's expert arrived at this figure by discounting the trust value according to the life expectancy of Husband's mother.

10. At trial, Husband offered the father's trust into evidence. Wife objected, and the trial court sustained the objection. On offer of proof, Husband outlined the terms of his father's trust for the record.

11. For example, although the trial court might find that the agreement did not afford a "fair and reasonable provision" for a spouse, a finding of either a "full, fair and frank disclosure of the other spouse's worth made before execution of the contract," or a "generally accurate knowledge of the other's worth," will be sufficient to sustain the efficacy of the agreement. *Burgess,* 1982 OK CIV APP 22, ¶ 19, 646 P.2d at 626.

¶ 33 A disclosure need not be exact, and a generally accurate disclosure is sufficient:

> Fair disclosure is not synonymous with detailed disclosure such as a financial statement of net worth and income. The mere fact that detailed disclosure was not made will not necessarily be sufficient to set aside an otherwise properly executed agreement. Where the agreement was freely executed, the fact that one party did not disclose in detail to the other party the nature, extent, and value of his or her property will not alone invalidate the agreement or raise a presumption of fraudulent concealment. (Citation omitted.) Fair disclosure contemplates that each spouse should be given information, of a general and approximate nature, concerning the net worth of the other. Each party has a duty to consider and evaluate the information received before signing an agreement since they are not assumed to have lost their judgmental faculties because of their pending marriage.

*In re Estate of Lopata, Lopata v. Metzel,* 641 P.2d 952, 955 (Colo.1982).[12] In the present case, a disclosure that exceeds Wife's evidence of value is sufficient to meet the disclosure requirement of *Burgess.*

### GENERALLY ACCURATE KNOWLEDGE OF THE OTHER'S WORTH

¶ 34 This is often the only factor that courts find present when enforcing antenuptial agreements. In *Burgess,* there was no provision for Wife, nor disclosure of assets recited in the agreement, but the appellate court reversed the trial court's refusal to enforce the antenuptial agreement, specifically because the wife had "a generally accurate awareness of the extent of her betrothed's property." 1982 OK CIV APP 22, ¶ 26, 646 P.2d at 627. As the Court noted in *Burgess:*

> .... "If, when she signed the contract freely and voluntarily, she had some understanding of her rights and had been fully informed by the husband as to his property or if, notwithstanding the husband's failure to disclose, *she had or reasonably should have had a general and approximate knowledge of the character and extent of his property she will be bound.*"

1982 OK CIV APP 22, ¶ 28, 646 P.2d at 627.[13] (Emphasis added.) In *Leonard,* the Supreme Court noted that antenuptial agreements will be enforced where wife "knew or ought to have known that [husband] possessed real and personal property substantially of the amount and value shown by the evidence." 1935 OK 427, ¶ 10, 43 P.2d at 779.[14]

¶ 35 After dating for over a year, Wife knew that Husband worked at the family television station in Oklahoma City, that he commuted to Muskogee to check on the family food business, and often went to Arkansas to check on the television stations there. This knowledge, coupled with his disclosure of an expectancy interest, his tax return, and assets and values—even if on income tax basis—clearly provided Wife with a generally accurate awareness of the extent of Husband's property and worth.

### SUMMARY

¶ 36 The parties' antenuptial agreement was not void as contrary to public policy. Wife failed to prove fraud in the financial disclosures by clear and convincing evidence. All of the *Burgess* factors were met. The order of the trial court is therefore REVERSED, and the cause REMANDED for entry of an order in accord with the parties' antenuptial agreement.

CAROL M. HANSEN, J., dissents with separate opinion; MITCHELL, P.J., concurs.

CAROL M. HANSEN, J., dissenting:

¶ 1 I agree with the majority's statement of the applicable law, but disagree with its conclusion the trial court's fact findings were clearly contrary to the weight of the evi-

---

12. See also, 41 C.J.S., Husband and Wife, § 67.

13. Quoting, *Del Vecchio v. Del Vecchio,* 143 So.2d 17 (Fla.1962).

14. Quoting, *Yarde v. Yarde,* 187 Ill. 636, 58 N.E. 600.

dence. The majority's review of the record lacks the deference to which the trial court's findings are entitled under this standard of review. In an equity case, we must begin our review by presuming the trial court's findings are correct. *Baytide Petroleum, Inc. v. Whitmar Exploration Co.,* 18 P.3d 378, 380, 2000 OK CIV APP 120. We will then examine the entire record and reweigh the evidence, and will reverse the trial court's judgment if its findings are clearly contrary to the weight of the evidence. *In Re Estate of Pope,* 1990 OK 125, 808 P.2d 640, 646. If, on the other hand, the evidence reasonably tends to support the findings of the trial court, we will not disturb the judgment on appeal. *Boughan v. Herington,* 1970 OK 125, 472 P.2d 434, 436.

¶ 2 The record in this case contains evidence reasonably supporting the trial court's findings as to the three-part test of *In Re Burgess' Estate,* 1982 OK CIV APP 22, 646 P.2d 623, 625, for the validity of antenuptial agreements:

1. Is fair and reasonable provision made for the party opposing the contract?

2. If not, was a full, fair and frank disclosure of the other spouse's worth made before execution of the contract?

3. If neither of the above, did the party opposing the contract in fact have a generally accurate knowledge of the other's worth?

In determining whether the contract made fair and reasonable provision for the party opposing it, the court may consider whether the provision is grossly disproportionate to the interest that party would acquire by operation of law in case the marriage took place. *In Re Cobb's Estate,* 1956 OK 299, 305 P.2d 1028, 1032. Although an antenuptial waiver of the right to an equitable division of jointly acquired property is no longer void as against public policy, it may be relevant to the court's determination of whether the contract made fair and reasonable provision for the party opposing the contract.

¶ 3 The antenuptial contract in the instant case contained representations by each party that the schedules attached to the agreement listed all of his or her real or personal property and set forth the value of the property.

Each party disclaimed forever any right in the other party's separate property as scheduled, any income or gain therefrom, and any property or income the other party should acquire during the marriage. The contract provided that in the event of divorce, neither party would seek nor be entitled to alimony, support, division of marital assets, costs, attorney fees, or any other money or property from the other, except that John agreed to pay Polly a lump sum, the amount of which increased according to the length of the marriage. If the divorce occurred after five years but before ten years from the date of marriage, John would pay Polly $250,000.00; if it occurred after ten years, he agreed to pay $500,000.00.

¶ 4 The schedule of assets John attached to the agreement was entitled "Statement of Assets and Liabilities—Income Tax Basis, John W. Griffin Trust, January 31, 1991," and represented his net worth at $2,578,563.74. In the transcript of the meeting in which the parties executed the contract, John's attorney referred to the schedule four times as setting forth the "fair market value" of John's assets. John's accountant testified his firm generated the schedule of assets and liabilities, and it represented the income tax basis of the assets, not the book value or fair market value. Polly's finance and economics expert witness testified tax basis was the amount paid for an asset, adjusted down for depreciation and up for improvements. He opined the fair market value of the television subsidiaries on John's asset list at the time the antenuptial agreement was signed was $20 million to $29 million, and John's interest, including his beneficial interest in his father's trust, was $12,620,400.24, rather than the $1.8 million shown on the schedule. He also testified the value of the publicly traded stocks on the asset list was understated.

¶ 5 Polly testified she believed John's schedule of assets was accurate at the time she signed the antenuptial agreement and that it reflected the fair market value of the assets listed.

¶ 6 This record contains evidence from which the trial court could find the antenup-

tial contract did not make fair and reasonable provision for Polly, John did not make full, fair and frank disclosure of his worth before execution of the contract, and Polly did not in fact have a generally accurate knowledge of John's worth. The evidence is sufficient to meet Polly's burden of proof on these issues. I would affirm the trial court's judgment.