**Homer REEG, Plaintiff-Appellant,**

v.

**Dr. Dennis M. SHAUGHNESSY and Jack D. Fetzer, M.D., Inc., Defendants-Appellees.**

**No. 76–1790.**

United States Court of Appeals, Tenth Circuit.

Submitted Nov. 17, 1977.

Decided Jan. 20, 1978.

Larry A. Tawwater and Wayne Wells of Lampkin, Wolfe, Burger, McCaffrey & Norman, Oklahoma City, Okl., for plaintiff-appellant.

Calvin W. Hendrickson, Jr., Oklahoma City, Okl. (Robert C. Margo, Oklahoma City, Okl., on brief), for defendants-appellees; Pierce, Couch, Hendrickson & Short, Oklahoma City, Okl., of counsel.

Before SETH, HOLLOWAY and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

In this diversity action Homer Reeg appeals from a jury verdict in favor of Dr. Dennis M. Shaughnessy, wherein Reeg had charged Shaughnessy with committing medical malpractice in diagnosis and treatment. Reeg specifically alleged that Dr. Shaughnessy had failed: to diagnose his (Reeg's) dislocated right hip; to treat this condition properly; and to refer him to a specialist. He further alleged that thereafter he had to undergo arthroplasty, an operation in which one's hip joint and socket are replaced.

The medical treatment spawning this action spanned a three-month period. On January 9, 1974, Reeg, then 64 years of age, was involved in a traffic mishap in which he sustained serious injury to his left leg, right hip and chest. At the emergency room of a hospital in Woodward, Oklahoma, a small northwestern Oklahoma community, Reeg was examined by Dr. Jack D. Fetzer, a general practitioner and associate of Dr. Shaughnessy. Dr. Fetzer ordered that X-rays be taken of Reeg's leg and hip. After the examination, Dr. Fetzer requested that Dr. Shaughnessy supervise Reeg's treatment, inasmuch as he had treated Reeg on a previous occasion and also because Dr. Shaughnessy had treated many orthopedic patients in Woodward during the course of his six-month association with Dr. Fetzer. When admitted to the hospital Reeg was described as being in a "shocky" condition, i. e., that although he had not actually gone into a state of shock, his vital signs indicated that he could easily do so if he were given an anesthetic or otherwise disturbed.

Dr. Shaughnessy examined the X-rays ordered by Dr. Fetzer and determined that Reeg had a comminuted left tibia and a displaced fractured acetabulum (the cup that holds the femur in place), but that there was no evidence of a dislocation of the femur ("thigh bone"). At that time Dr. Shaughnessy consulted with Dr. C. H. Williams, a radiologist who visited the Woodward Hospital two to three times a week to consult with local physicians. Dr. Williams confirmed Dr. Shaughnessy's diagnosis that there had been no dislocation of the femur. Because of Reeg's "shocky" condition, Dr. Shaughnessy chose to wait for two days until the condition had stabilized before treating specific injuries. He then operated to repair the broken left tibia. Dr. Shaughnessy prescribed a conservative treatment of confinement in bed for the injury to the right hip. Reeg remained hospitalized for three weeks, during which time he often complained of pain.

On February 1, Reeg was asked to try to put some weight on his right leg. This activity ceased when he complained of pain. On February 4, Dr. Shaughnessy ordered another X-ray on Reeg's right hip. At that time there was evidence of a slight dislocation of the femur. Dr. Shaughnessy chose to continue the conservative treatment he had begun, rather than to try to reduce the hip (replace the head of the femur back into the hip socket). Reeg was dismissed from the hospital on crutches. Dr. Shaughnessy did not instruct him to stay off the right leg and hip.

On February 24, Reeg visited Dr. Shaughnessy at his office where another X-ray of the right hip revealed that there was a dislocation of the femur. Dr. Shaughnessy tried to reduce the hip manually. He sent Reeg home with the advice to keep off his right leg.

An X-ray taken on March 11 showed that the hip was again out of the socket and Dr. Shaughnessy then performed a manual reduction of the hip joint. On April 1, Dr. Shaughnessy took the fifth X-ray of Reeg's hip. He noted that there was still a dislocation. On April 15, Dr. Shaughnessy referred Reeg to an orthopedic surgeon in a neighboring community who performed an open reduction on Reeg's hip. The following year Reeg underwent arthroplasty at Mayo Clinic.

At trial Reeg offered in evidence depositions of a number of expert witnesses. Using the "locality rule" as its guide, the trial court sharply limited the scope of the medical testimony to expert medical testimony and opinions relating to the degree of skill required by doctors *in the same or similar communities.*

On appeal Reeg alleges that the trial judge erred by: (1) applying the "locality rule," rather than the broader standard of "acceptable medical practice"; (2) allowing Dr. Shaughnessy to be judged by the standard of a general surgeon rather than that of an orthopedic surgeon; (3) refusing to grant a continuance when it became evident that the "locality rule" was to be used; and (4) refusing to admit portions of testimony given by deposition of an expert witness elicited during cross-examination by Dr. Shaughnessy's counsel.

## I.

██ Reeg contends that the trial court erred in holding that the "locality rule" was the law of Oklahoma with regard to the degree of care owed by a physician to his patients. The rule is said to have its origin in the 1880 case of *Small v. Howard,* 128 Mass. 131 (1880), *ovrld, Brune v. Belinkoff,* 354 Mass. 102, 235 N.E.2d 793 (1968), involving a suit against a doctor practicing in a small country community. The court held that the country doctor there sued "was bound to possess that skill only which physicians and surgeons of ordinary ability and skill, practising in similar localities, with opportunities for no larger experience ordinarily possess[ed] . . . ." 36 A.L.R.3d 425, 443 (1971). In a medical malpractice action the plaintiff must show what the requisite standard of care is for a physician and surgeon and that the doctor failed to act in accordance with that standard. Here, Oklahoma law must control in regard to the applicable standard, for in all diversity cases federal courts must apply the substantive law of the forum state. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1935).

In determining that the "locality rule" controlled herein, the trial court specifically relied on *Runyon v. Reid,* 510 P.2d 943 (Okl.,1973), in which the defendants included a psychiatrist and a general practitioner. There the court noted in discussing the standard of care required of a specialist:

> A medical specialist owes a duty to his patient to exercise the degree of skill ordinarily employed under similar circumstances by similar specialist in the field in the *same or similar communities.* (Emphasis supplied.)
> 510 P.2d, at p. 950.

In *Runyon* the court utilized the performance of other doctors in the locality along with doctors in similar communities as the standard for acceptable medical practice. In so doing the Oklahoma Supreme Court effectively expanded on the "locality" standard by including the degree of skill practiced by doctors in "similar communities." Prior to *Runyon,* the standard of care had

been that in "the general community." *Eckels v. Traverse,* 362 P.2d 680 (Okl.1961).

Reeg maintains that the broadened "locality rule" which was announced in *Runyon* is no longer viable because of *Karriman v. Orthopedic Clinic,* 516 P.2d 534 (Okl. 1973), which was rendered seven months after *Runyon.* In *Karriman* orthopedic surgeons were sued on both negligence and breach of express warranty theories. Reeg contends that in *Karriman* the Oklahoma law was changed from a local medical standard of care to a much broader standard of accepted medical care, regardless of locality.

In *Karriman* a detailed, lengthy instruction for standard of care was given which did not contain language referring to the quality of practice in same or similar locality. The Oklahoma Supreme Court approved the instruction which read in part:

> "You are instructed that physicians or surgeons are required to possess and exercise reasonable skill, diligence, and care in treating patients. He must possess and exercise, in diagnosis and treatment, a reasonable degree of learning, skill, diligence and caution which is ordinarily used and possessed by others in his profession."
> 516 P.2d, at p. 537.

However, the instruction also provided that a doctor was still required to use that degree of care required of doctors in similar circumstances:

> "It is his duty to possess and use the care ordinarily exercised in like cases by reputable members of his profession practicing *in and under similar circumstances.*" (Emphasis supplied.)
> (Id.)

Finally, the court instructed that an orthopedic surgeon was held to a standard of care of a careful orthopedic surgeon, without concern for locality:

> An orthopedic specialist is required to exercise reasonable skill and care in treating a patient, which is that skill and

care ordinarily used by careful and skillful orthopedic specialists.

(Id.)

Based on this instruction and other language contained in *Karriman,* Reeg urges us to hold that the Supreme Court of Oklahoma has discarded the "locality rule." In order to ascertain whether Reeg's interpretation is correct, we must discuss several factors.

In *Karriman,* the court relied in part on *Kernodle v. Elder,* 23 Okl. 743, 102 P. 138 (1909) and *Champion v. Kieth,* 17 Okl. 204, 87 P. 845 (1906), which do not refer to the "locality rule." We observe, however, that both of these decisions, as well as *Karriman,* are concerned, in part, with a medical malpractice action brought on a *contractual theory.* We also note that in *Karriman* there is no mention of either *Runyon* or *Eckels* in which the "locality rule" standard was so clearly articulated.

■ *Karriman* is not controlling here. Dr. Shaughnessy, unlike the defendants in *Karriman,* is not an orthopedic surgeon and, furthermore, this action is based on a negligence rather than a contractual theory. Although Oklahoma law apparently holds specialists to a higher standard of care than that required of general practitioners, it would have been improper to hold Dr. Shaughnessy to a standard of an orthopedic surgeon, inasmuch as he was not board certified in that specialty. Furthermore, in *Karriman* and its predecessors the language which Reeg urges us to construe as vitiating the "locality rule" is not applicable in a malpractice action based on a negligence theory. In *Karriman,* the cause of action was predicated on the theory that the doctor had breached his contractual promise to cure the plaintiff-patient. We note that all of the cases and encyclopedic material relied upon by the author of *Karriman* deal exclusively with actions based on the contract theory. We are disinclined to hold that the very court which had vigorously declared the "locality rule" to be alive and well in *Runyon* would, without reference to that case, seven months later overrule the "locality rule" standard. We are not persuaded that the Oklahoma Supreme Court either expressly or impliedly altered its position on the "locality rule." It is not our function to "formulate the legal mandate of the state, but merely to ascertain and apply it." *Hardy Salt Co. v. Southern Pacific Transport Co.,* 501 F.2d 1156 (10th Cir. 1974), *cert. denied,* 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974).

■ The Oklahoma intermediate appellate court still recognizes the community standard. Two years after *Karriman,* it declared in a medical malpractice suit that *"plaintiff sustained her burden of producing expert evidence establishing the medical standard in the community." Robertson v. LaCroix,* 534 P.2d 17, 22 (Okl.App., 1975). (Emphasis supplied.) Thus it may be reasonably inferred that in medical malpractice suits based upon facts and circumstances similar to those contained in this record a plaintiff must present evidence in conformity with the "locality rule."

■ Reeg finally contends that even if Oklahoma still retains the "locality rule," the parties had agreed that they would use the national standard instead. It is settled that parties cannot stipulate that the law of a forum will not control, but that other law will control. *Estate of Sanford v. Commissioner of Internal Revenue,* 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. 20 (1939); *Swift and Co. v. Hocking Valley RR Co.,* 243 U.S. 281, 37 S.Ct. 287, 61. L.Ed. 722 (1917). However, even should that rule be applicable, still there is nothing in the record before us indicating that such an agreement was entered into by the parties. We deem it particularly significant that nothing in the pretrial orders, prepared by Reeg's attorney, states that the parties had come to such an understanding. Under the provisions of Rule 16, Fed.R.Civ.P., 28 U.S.C.A., the pretrial order controls. *Associated Press v. Cook,* 513 F.2d 1300 (10th Cir. 1975). The trial court did not err in applying the "locality rule."

## II.

Reeg maintains that because Dr. Shaughnessy held himself out as a specialist in orthopedic surgery, he should be held to the standard of an orthopedist, rather than that of a general surgeon. Inasmuch as the trial court refused to hold Dr. Shaughnessy to the higher standard urged by Reeg, much of the depositional testimony proffered by Reeg was not admitted.

In addition to the usual medical school training required for licensing, Dr. Shaughnessy completed three years of a four year residency in general surgery. During that period he was exposed to a variety of surgical experiences, including orthopedic surgery. In the course of his short tenure in Woodward, he had performed more than half of the orthopedic operations for the Fetzer Clinic. He was not, however, a board certified surgeon in either the general or orthopedic fields.

Whenever Reeg's expert witnesses were called to render their opinions as to Dr. Shaughnessy's competence, their testimony was not admitted if the questions did not include that standard of care required of a general surgeon. Among the instructions to the jury, Dr. Shaughnessy was described as a "general surgeon" and "a medical specialist such as a general surgeon."

█ Physicians are deemed to be specialists in a variety of ways. The most common classification is on the basis of education and certification. A specialist generally is defined as a doctor who has served a residency, taken and successfully passed examinations for certification and one who limits his practice to a particular medical area. Lawyers Medical Encyclopedia, Vol. I, 13–18 § 1.8–1.10 (1966). A physician is also considered, in law, bound to the standard of a specialist if he holds himself out as such. A specialist is:

A physician who confines his practice to specific diseases or disabilities. A physician who holds himself out as having special knowledge and skill in the treatment of a particular organ or disease and

who is bound to bring to the discharge of his duty to patients employing him as a specialist that degree of skill and learning ordinarily possessed by physicians who devote special attention and study to such organ or disease, having regard to the present state of scientific knowledge.

Ballentine's Law Dictionary, Bancroft-Whitney Co., 1969, at p. 1199.

*See also:* 21 A.L.R.3d 953 (1968), "Physicians & Surgeons: Standard or Skill and Care Required of a Specialist."

█ Reeg contends that because Dr. Shaughnessy had been employed by the Clinic to perform surgery and had performed many orthopedic operations in the area that he had thereby held himself out as an orthopedic surgeon. We observe that even though Dr. Shaughnessy had performed numerous orthopedic operations, there is no record that he held himself out as an orthopedist. The standard of care to be employed by a physician possessed of unusual skill or knowledge is that which is reasonable in light of his special knowledge and training. Prosser, Law of Torts, 4th edition, 1971, p. 164. Under that standard Dr. Shaughnessy should have been held to that degree of care commensurate with his training and experience rather than the higher standard of an orthopedic surgeon.

█ We agree that Dr. Shaughnessy, because of his additional training and expertise, was properly held to a higher standard of care than that required of a general practitioner as instructed by the trial court. It is noteworthy, we believe, that the court instructed that Dr. Shaughnessy was to be held to the standard of a general surgeon. This instruction required a higher standard of care of Dr. Shaughnessy than his training and experience warranted. Dr. Shaughnessy was not a board certified orthopedic surgeon and he did not hold himself out as a specialist. Accordingly, the trial court did not prejudice Reeg by instructing that Dr. Shaughnessy was to be regarded as a general surgeon.

**316**

### III.

Reeg further contends that the trial court erred in not granting him a continuance after ruling that Reeg's proffered testimony relative to "accepted medical standards" was not admissible. He argues that much of his evidence was derived from depositions, and that it was, therefore, an abuse of judicial discretion not to grant him additional time to retake the depositions, posing questions related to the community standard of care determined applicable by the trial court.

The granting of a motion for continuance is directed to the sound discretion of the trial court. *Community National Life Insurance Company v. Parker Square Savings and Loan Association,* 406 F.2d 603 (10th Cir. 1969). It is not an abuse of discretion to deny a motion for a continuance, based on a need for further discovery, if the evidence sought is within the scope of prior pretrial orders and issues and the movant has access to the information. *Continental Baking Co. v. Old Homestead Bread Company,* 476 F.2d 97 (10th Cir. 1973), *cert. denied,* 414 U.S. 975, 94 S.Ct. 290, 38 L.Ed.2d 218 (1973). If a pretrial order clearly defines the issues involved in the action, and sets forth a deadline for completion of discovery, a continuance for additional discovery will not be granted where the failure is attributable to lack of diligence. *R. H. Fulton v. Coppco, Inc.,* 407 F.2d 611 (10th Cir. 1969).

In the case at bar, Reeg was neither surprised nor prejudiced by use of the "locality rule." In an order which dealt with discovery matters dated May 12, 1976, two months before trial, the court delineated the requisite standard of care:

Proof of malpractice requires proof among other things as to the recognized standards of the medical care and treatment in the *community* in the particular kind of case with the showing that the physician negligently departed from these standards in his treatment or diagnosis of the condition of the plaintiff. (Emphasis supplied.)

[R., Vol. VI, p. 56.]

quoting *Pearce v. United States,* 236 F.Supp. 431, 432–433 (W.D.Okl.1964). Thus, Reeg was apprised, well in advance of trial, of the standard of care which the trial court intended to be applicable at trial. If Reeg believed then that he would be substantially prejudiced thereby, he should have moved for a postponement of the upcoming trial for the purpose of taking new or additional depositions. Instead, Reeg elected not to seek the continuance until after he had presented all of his evidence at trial. Thus, Reeg was neither prejudiced nor surprised by the trial court's use of the "locality rule."

### IV.

Reeg contends that the trial court erred by refusing to admit into evidence an answer which Dr. Shaughnessy's counsel had elicited on cross-examination while the deposition of one of Reeg's expert witnesses was being taken. The specific question posed to Dr. Burgtorf, one of Reeg's expert witnesses who had operated on Reeg after he had been treated by Dr. Shaughnessy, was:

Q. Well, do I understand your testimony correctly, that you were in essence not able to cure this man's hip problem largely because of Dr. Shaughnessy? Was this Dr. Shaughnessy's fault?

[R., Vol. III, pp. 462–463.]

The trial court did not admit the answer to that question, which was "yes." In so ruling, the trial court held that the question had not been framed within the confines of the "locality rule." Generally, one posing a question cannot then object to the answer if it is properly responsive. It is important here to observe, however, that both the question and the answer were posed and received by deposition. Testimony obtained from depositions is admissible "if rules of evidence permit." Fed.Rules Civ.Proc. 32(a), 28 U.S.C.A. Objections to receipt in

evidence of depositional testimony, in whole or in part, may be made at trial for any reason which would require the exclusion of the evidence if the witness were present and testifying at trial. Fed.Rules Civ.Proc. 32(b), 28 U.S.C.A. The admission of testimony in a deposition is within the sound discretion of the trial court. *Sims Consolidated, Ltd. v. Irrigation and Power Equipment, Inc.*, 518 F.2d 413 (10th Cir. 1975), *cert. denied*, 423 U.S. 913, 96 S.Ct. 218, 46 L.Ed.2d 141 (1975).

The trial court excluded the aforesaid answer "yes" in the deposition in that it did not fall within the limits of the "locality rule." Only relevant evidence is admissible at trial. Fed.R.Evid., rule 402. Here, the question posed and the answer given exceeded the bounds of the "locality rule." Thus, the evidence was not relevant. However, assuming *arguendo* that the testimony should not have been excluded, we hold that its exclusion constituted harmless error only. The exclusion was not inconsistent with substantial justice, Fed.Rules Civ.Proc. rule 61, 28 U.S.C.A. The exclusion of evidence, though improper, need not always give rise to reversible error. *Sims Consolidated, Ltd., supra; Hardy Salt Co., supra; Ottinger v. Siegfried*, 349 F.2d 647 (10th Cir. 1969). In light of the fact that the trial court consistently excluded evidence which did not meet the measure of the "locality rule," the exclusion of this evidence did not constitute a substantial injustice.

WE AFFIRM.