Gloria O'NEIL and Jim L. O'Neil, Plaintiffs-Appellants,

v.

GREAT PLAINS WOMEN'S CLINIC, INC. a professional corporation; Burt C. Montague, Defendants-Appellees.

No. 81–1973.

United States Court of Appeals, Tenth Circuit.

April 11, 1985.

Howard K. Berry, Jr., Berry & Berry, P.C., Oklahoma City, Okl., for plaintiffs-appellants.

Robert C. Margo, Short Barnes Wiggins Margo Adler & Worten, Oklahoma City, Oklahoma, for defendants-appellees.

Before HOLLOWAY, Chief Judge, and TIMBERS * and LOGAN, Circuit Judges.

HOLLOWAY, Chief Judge.

On stipulation of the parties and after examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed.R. App.P. 34(a); Tenth Circuit R. 10(e). The cause is therefore ordered submitted without oral argument.

Plaintiffs Gloria O'Neil and Jim L. O'Neil timely appeal from an adverse judgment in this diversity action. After trial to a jury, judgment was entered against them on Mrs. O'Neil's malpractice claim for injuries to her and Mr. O'Neil's claim that he is entitled to damages for loss of consortium resulting from the malpractice injuries to his wife. For reversal, the plaintiffs make these principal arguments: (1) the district court erred in instructing the jury that the standard of care applicable to a nationally board certified specialist is measured by medical standards applicable in the same or similar communities; and (2) the trial judge erred in limiting argument to 20 minutes to a side in this complicated medical malpractice case involving several expert witnesses, testimony on injuries, and two distinct plaintiffs' claims.

I

On April 4, 1978, Mrs. O'Neil was admitted to the Comanche County Memorial Hospital in Lawton, Oklahoma, by Doctor Burt C. Montague, for exploratory surgery and a probable hysterectomy. Dr. Montague practiced medicine in a group which was organized as a professional corporation, the Great Plains Women's Clinic, Inc., and it was stipulated that he was the agent of the Clinic. On opening the abdomen, Dr. Montague determined that a complete hysterectomy was necessary and performed this surgery. During the first seven days of her postoperative care, Mrs. O'Neil became gravely ill. Another surgeon who was consulted performed exploratory surgery on April 11, 1978, and discovered a gangrenous colon, which required the removal of a portion of Mrs. O'Neil's bowel and intestine.

At trial plaintiffs contended that the defendant doctor was guilty of malpractice in (1) failing to give more conservative care before performing a hysterectomy; (2) failing to perform a laparoscopic examination before that operation; and (3) using excessive packing and undue force in placing retractors during the hysterectomy, causing gangrene in the colon, resulting death of the tissue, and subsequent surgeries for the removal of intestines. Brief of Appellants at 2. Defendants maintained that Mrs. O'Neil suffered from pre-existing Crohn's disease, *see* note 3, *infra*, which

---

* The Honorable William H. Timbers, United States Circuit Judge of the Second Circuit, sitting by designation.

caused the gangrenous colon, that this problem was not the result of any breach of the proper standard of care during the hysterectomy, and that no malpractice occurred.

The trial judge instructed the jury in part as follows on the applicable standard of care:

You are instructed that a physician who holds himself out as having special knowledge and skill in the treatment of some particular organ or disease is required to exercise, in his treatment of one who employs him as a specialist, that degree of skill and care ordinarily employed *under similar circumstances by a similar specialist in the field in the same or similar communities*, and that his duty to his patient is measured by a higher standard of skill than that of a general practitioner.

\* \* \* \* \* \*

A physician and surgeon is never considered as warranting or guaranteeing a cure, unless a special contract is made for that purpose, but his contract is that he possesses and will use that reasonable degree of learning and skill ordinarily possessed by members of his profession, as aforesaid, and that he will use such ordinary care and diligence in the treatment or surgery of the case.

You are instructed that the law requires that *a physician shall have and exercise that degree of learning and skill ordinarily possessed by a physician in similary* [sic] *practice in the same or similar community*, and he is charged with using ordinary care and diligence in applying that learning and skill to the treatment of his patient.

\* \* \* \* \* \*

"Ordinary care," as used in connection with the duty of a physician and surgeon, means complying with acceptable medical standards, *which is that degree of care which is ordinarily exercised by physicians and surgeons in the same or similar community*, under circumstances similar to those existing at the time and in cases similar to the particular case in question.

A physician or surgeon is not responsible for damages for want of success in medical treatment or surgery *unless it is shown to be the direct and proximate result of want of ordinary skill and learning such as is ordinarily possessed by others of his profession in the same or similar community*, or for want of ordinary care and attention.

X R. 372–74. (emphasis added).

The plaintiffs' attorney objected to the charge on the ground that the instruction on the standard of care in the same or similar medical community was given at several places. *Id.* at 382–83. Counsel argued that where the defendant is a specialist the locality rule is no longer applicable.

The jury returned a verdict for the defendants.

## II

Plaintiffs argue on appeal that the instruction of the trial court, quoted above, was in error because of its reliance on the locality rule. Plaintiffs say that this locality rule is not applicable in defining the standard of medical skill owed by a board certified specialist to a patient, that the locality rule as applied to cases involving nationally certified specialists such as Dr. Montague is obsolete, and that thus the locality rule should not be followed here. Plaintiffs cite a concurring opinion in *Ely v. Harris*, No. 44,809, slip op. (Okla.1973), Hodges, J., concurring, joined by Doolin, J., and *Pesantes v. United States*, 621 F.2d 175 (5th Cir.1980), and other cases rejecting the locality rule where certain specialists are involved.

■ We now have a recent opinion in Oklahoma involving a physician who was board certified by the American College of Obstetrics and Gynecology. *Spellman v. Mount*, 696 P.2d 510 (Okla.Ct.App.1984), *cert. denied*, 56 O.B.J. 603 (March 9, 1985). The opinion was released for publication by order of the Oklahoma Court of Appeals.

Under the policy on publication of appellate opinions adopted September 24, 1973, such an opinion thus published does not have precedential effect but may be considered persuasive. *See* New Policy On Publication Of Appellate Opinions, *West's Oklahoma Court Rules and Procedure* 1984–1985 at 533. In this diversity case involving a malpractice claim, Oklahoma law is controlling. *Reeg v. Shaughnessy*, 570 F.2d 309, 313 (10th Cir.1978). And in examining the Oklahoma law, in the absence of a state supreme court ruling, the federal court must follow an intermediate state court decision unless other authority is convincing that the state supreme court would decide otherwise. *Delano v. Kitch*, 663 F.2d 990, 996 (10th Cir.1981), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982); *see also* 19 Wright, Miller & Cooper, *Federal Practice & Procedure* § 4507 at p. 94–95. In light of the *Spellman* opinion, we must agree that where a nationally board certified specialist is involved, it now appears that Oklahoma would view the matter as involving a national standard of care.

In 1983, the Oklahoma legislature enacted Okla.Stat.Ann. tit. 76, § 20.1 (West Supp.1984) which provides that

> [t]he standard of care required of those engaging in the practice of the healing arts within the State of Oklahoma shall be measured by national standards.

It has been held that such a legislative change of the standard of care should be applied retroactively. *Pesantes v. United States*, 621 F.2d 175, 178–79 (5th Cir. 1980). The *Spellman* opinion, however, turned to the decisional law before the enactment of the new Oklahoma statute in deciding the malpractice case before it which arose in December 1974. The concurring opinion of Justice Hodges in *Ely v. Harris, supra*, was quoted at length, with its reasoning that urbanization and technological advances mean that geographical location is no longer an essential element in determining the standard for such cases; that the locality rule is not recognized by the medical profession itself; and that in light of board certification on national standards, it is incongruous to hold that rural patients or those in a certain locality are not entitled to the same standard of medical proficiency as those in urban or other localities. *Spellman,* 696 P.2d at 511. Pointing out that the physician involved there was board certified by the American College of Obstetrics and Gynecology, as was the doctor in the instant case, the *Spellman* court concluded that

> [w]e hold that "similar communities," as applied to the standard of care expected of board certified physicians, means a national standard of care.

*Id.*

We have considered *Runyon v. Reid*, 510 P.2d 943 (Okla.1973), and *Reeg v. Shaughnessy*, 570 F.2d 309 (10th Cir.1978), relied on by the defendants[1]. However, in view of *Spellman*, we conclude that in this Oklahoma diversity case involving a malpractice claim against a physician certified by a

---

1. The defendants also rely on an unpublished opinion cited by the trial court in his order denying plaintiffs' motion for a new trial. In that opinion which was designated "Not for Publication in Official Reporter" the Oklahoma Supreme Court, citing *Runyon v. Reid*, 510 P.2d 943 (Okla.1973), stated that "[a] medical specialist owes a duty to his patient to exercise the degree of skill ordinarily employed under similar circumstances by similar specialists in the field in the same or similar communities." *Sanders v. de Quevedo*, No. 52,402, slip op. (Okla.1981). We note, however, that Rule 1.200, Rules of Appellate Procedure in Civil Cases, Okla.Stat.Ann. tit. 12, Ch. 15, App. 2 (West Supp. 1984), provides in part:

All memorandum opinions, unless otherwise required to be published, shall be marked: "Not for Official Publication." Since unpublished opinions are deemed to be without ·value as precedent and are not uniformly available to all parties, opinions so marked shall not be considered as precedent by any court or in any brief or other material presented to any court, except to support a claim of *res judicata*, collateral estoppel, or law of the case.

Thus we do not find persuasive the defendant's arguments in favor of the locality rule, based on that unpublished 1981 opinion, in light of the more recent *Spellman* opinion, which was released for publication by the Court of Appeals.

national board, the national standard of care as adopted in the *Spellman* case applies.

## III

■ For the reasons expressed above, we must agree that the national standard of care rationale from *Spellman* applies in this case. As noted earlier, the charge by the trial judge, who did not have the advantage of the *Spellman* opinion at the time of trial, did refer repeatedly to the locality rule in instructing on the standard of care. In light of the *Spellman* opinion, the instructions were in error. Nevertheless, on consideration of the record as a whole, we are not convinced that the charge requires reversal.

We must base our judgment on an examination of the record "without regard to errors or defects which do not affect the substantial rights of the parties." 28 U.S.C. § 2111. Here we are convinced that the battlelines were not drawn at this trial between national standards relied on by the plaintiffs, and a defense based on local standards applicable in the community of Lawton, Oklahoma, or similar communities. Instead, the case was fought out on the claims of the plaintiffs' experts, Dr. Scarpitti and Dr. Lowe, that the defendant physician should have conducted a laparoscopy examination before surgery to determine how much endometriosis Mrs. O'Neil had; that the later pathology reports revealed that the endometriosis was on just the serosal surface of the uterus and not elsewhere, thus not requiring a complete hysterectomy; and that the cause of Mrs.

O'Neil's gangrenous colon, part of which had to be removed, was probably a misplaced pack or misplaced retractor used during the surgery, which cut off the blood supply to the bowel.[2] X R. 25–29. (Dr. Scarpitti). Dr. Lowe also testified that the most likely cause of plaintiff's complication and the follow-up surgeries was a mishap with the retractor and/or the packing at the time of surgery. *Id.* at 146.

In response, Dr. Montague testified directly that he did not overzealously pack or retract. *Id.* at 206. Other defense witnesses similarly challenged the plaintiffs' claims and rejected the theory of injudicious packing or retracting. Dr. Dix, the pathologist who examined the removed tissue, disagreed strongly with the claim of improper packing or retracting and concluded that the cause of the plaintiff's problems was regional enteritis. *Id.* at 278. Dr. Dix used the term "transmural ileitis" elsewhere and explained that the different terms were descriptive ones for the same disease, Crohn's disease. *Id.*[3]

It is true that the defense expert, Dr. Puckett, did say that there was no improper care in response to a question on accepted standards of medical practice in Oklahoma City or Lawton. *Id.* at 332. Further, during the examination and cross examination of the experts, there were references to the fact that the board tests are national tests, as Dr. Scarpitti noted. *Id.* at 17. During his cross examination, the fact that Dr. Scarpitti was from Pennsylvania and had not ever been to the Lawton, Oklahoma, area, and that he was not famil-

---

2. The Brief of Appellants at 3 states that

[t]he defense claimed that the patient suffered pre-existing Crohns' Disease which caused the gangrenous colon while the patient claimed that excessive packing and the use of force on the retractors during surgery blocked the blood supply with the resulting gangrene. Dr. Lowe, a medical expert offered by the plaintiffs, had performed surgery later on Mrs. O'Neil in Oregon for the same problems. He opined that the cause of her problems was "inadvertent over-zealous use of a retractor and the subsequent compromise of the blood supply to the colon. . . ." *Id.* at 5.

3. Crohn's disease has been defined as "regional ileitis." *See Dorland's Illustrated Medical Dictionary* (25th ed.) at 377. Regional and segmental enteritis are defined as regional ileitis, which is defined as inflammation of the ileum. The condition is described as "a chronic granulomatous inflammatory disease of unknown etiology, commonly involving the terminal ileum with scarring and thickening of the bowel wall; it frequently leads to intestinal obstruction and fistula and abscess formation. Called also *Crohn's disease* and *regional enteritis*." The ileum is the distal portion of the small intestine, extending from the jejunum to the cecum; called also *intestinum ileum. Id.* at 522, 762.

iar with laparoscopies done in Oklahoma, was stressed. *Id.* at 36, 55–56.

However, in the portion of his direct examination establishing his qualifications, the plaintiffs' expert, Dr. Scarpitti, affirmed that he "would ... be familiar with the medical standards and principles that would be applicable to the treatment of [Mrs. O'Neil's] case in a similar medical community and under similar facts...." *Id.* at 20. This followed a hypothetical, by plaintiffs' counsel, describing a city of the size of Lawton with its hospitals. Moreover, none of the testimony of plaintiffs' two medical experts was objected to or excluded on the ground that they were not informed on the standard of care applicable in this case. Thus the record as a whole shows that the real dispute here was not over applicable standards but whether the defendant doctor had failed to conduct a proper exploratory and treatment procedure with cauterization, which was possible; whether unnecessary surgery was performed by doing the complete hysterectomy; and whether the doctor was guilty of any negligence in the retracting and packing procedures used. From its consideration of the testimony of the six medical experts and the plaintiffs, who testified, the jury considered these theories of malpractice and rejected them, being faced with sharply conflicting claims and denials of negligence. The record does not reveal claims and defenses actually turning on national versus local standards of medical skill as significant issues in the trial.

From our consideration of the record, we hold that the error in the charge relating to the locality rule did not affect the substantial rights of the parties and was harmless.

### IV

There remains the claim that the trial judge erred and abused his discretion in limiting counsel to twenty minutes to the side for closing arguments. Plaintiffs say that this malpractice case was complicated; that it consumed two days of trial; that it involved six experts, two lay witnesses, and two separate plaintiffs' claims; and that

liability and damages for two plaintiffs' theories had to be argued. Thus more extensive arguments were clearly required. Plaintiffs cite *Moses v. Proctor Coal Co.*, 166 Ky. 805, 179 S.W. 1043 (1915), where a twenty minute limitation to each side for argument of a personal injury case, tried for one day, was held error.

We do not have a transcript of the oral argument in our record. Hence we must assess the claim of error based on the time restriction placed on the arguments and the trial record of the evidence offered. Viewed in this light, we cannot say that there was an abuse of discretion or reversible error. "Supervision of oral argument is part of the procedural conduct of the trial and is primarily entrusted to the discretion of the trial court." *Carlin v. Stringer*, 365 F.2d 597, 599 (10th Cir.1966). The trial court's supervision must prevent a truly prejudicial result occasioned by surprise, and avoid manifest injustice. *Id.* We are not persuaded that the allocation of time for the closing arguments was error or an abuse of discretion here.

In sum, no reversible error is demonstrated and the judgment is accordingly AFFIRMED.