30 F.3d 141
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 James A. GANT, Joyce Sullivan, Janice Miller, Sharon Sparks,
individuals, Plaintiffs-Appellees,
v.
Geneva F. GANT, an individual, Defendant-Appellant.
 No. 93-6182.
 United States Court of Appeals, Tenth Circuit.
 Aug. 4, 1994.
 ORDER AND JUDGMENT[1]
 
 1
 Before ANDERSON and BRORBY, Circuit Judges, and MECHEM,[2] District Judge.
 
 
 2
 Ms. Geneva Gant appeals from a declaratory judgment that the antenuptial agreement which she signed at the request of her late husband is valid and enforceable. The agreement prevents Ms. Gant from sharing in the distribution of her late husband's estate beyond $48,000 in life insurance proceeds and other statutory allowances. She contends that the district court made clearly erroneous findings of fact and misinterpreted Oklahoma law in upholding the antenuptial agreement. We affirm.
 
 BACKGROUND
 
 3
 Ms. Gant married the late Mr. Jesse Gant on December 30, 1983. He was 63, she was 56. It was his third marriage, her fourth, and both had children from former marriages. Both had prior marriages that ended in divorce. At the time of their marriage, he was the sole or controlling shareholder in several corporations in Texas and Louisiana and had total assets that may have exceeded a million dollars.[3] She lived modestly but comfortably in a duplex in Durant, Oklahoma. She had a house full of her own furniture, an automobile, and approximately $30,000 in cash accounts. In the two years prior to meeting Jesse, she had earned a degree in Business Administration and had started on a master's degree from Southeastern Oklahoma State University, and had worked on campus as a clerk and office assistant.
 
 
 4
 On December 19, eleven days before they married, Jesse asked Geneva to join him in signing an antenuptial agreement, which they did in the presence of Jesse's attorney, Harley Venters. The one-page agreement, printed in standard-sized type with the words "ANTENUPTIAL AGREEMENT" appearing at the top, stated:
 
 
 5
 Whereas, both parties have children by former marriages and are desirous that this marriage should not in any way affect or change their legal rights, or that of their heirs in the property that each of them possess; ... It is ... agreed and understood that by virtue of said marriage neither party shall have or acquire any right, title, interest or claim in and to the property of the other.
 
 
 6
 ....
 
 
 7
 It is further agreed between the parties, that each has entered into this agreement with full knowledge of the nature and probable value of the estate of the other and with full knowledge of the rights conferred by law upon each in the estate of the other at such time as they become husband and wife, but with the intent and desire that the rights of each to the other's estate shall be governed by this agreement,....
 
 
 8
 Appellant's App. at 39.
 
 
 9
 The Gants were married until Jesse's death on March 26, 1991. Jesse died intestate. In the probate proceedings, Ms. Gant asserted a claim inconsistent with the antenuptial agreement. In response, Jesse's four children filed this action in diversity seeking a declaratory judgment as to the validity of the agreement.
 
 
 10
 The district court held a three-day bench trial and heard the testimony of numerous witnesses. Subsequently, it found that Ms. Gant was "intelligent, capable in business and generally well informed," and that through her courtship with Jesse she acquired a "generally accurate knowledge of Jesse's businesses." On the basis of these findings, and others, the district court concluded that the antenuptial agreement was "an enforceable and valid contract." Id. at 17, 19-20.
 
 DISCUSSION
 
 11
 Ms. Gant contends that the district court's findings were not supported by the evidence and do not support the legal conclusion that the antenuptial agreement is enforceable. Oklahoma law governs the validity of the agreement.[4]
 
 
 12
 Antenuptial agreements are enforceable under Oklahoma law, provided they are "fairly procured." Okla. Stat. Ann. tit. 84, 44; In re Estate of Cobb, 305 P.2d 1028, Syl. 1/2 2 (Okla.1956). To ensure fairness, antenuptial agreements that make no provision for the intended wife are given the "closest scrutiny." Cobb, 305 P.2d at 1031. Further, agreements that do not provide (or meagerly provide) for the intended wife are valid only where "a full and fair disclosure was made to her of the extent and value of [her prospective husband's] property before she signed it, or that she was aware to all intents and purposes of the nature, character and value of the estate which she was relinquishing...." Id. at 1032 (emphasis added).
 
 
 13
 Jesse did not affirmatively disclose the value of his assets to Ms. Gant before she signed the antenuptial agreement, and the agreement itself made no specific disclosure.[5] Therefore, the validity of the antenuptial agreement depends on whether Ms. Gant, through her six-month courtship with Jesse, became sufficiently "aware to all intents and purposes of the nature, character and value" of his estate before signing the agreement. Id. at 1032.
 
 
 14
 This standard is far from a bright-line rule. The words "nature, character and value," by themselves, say little about the degree of specificity and exactness that one must know of another's worth in order to be bound to an antenuptial agreement. Not surprisingly, Cobb cautioned against relying on "rule[s] of thumb" that can be applied to "all antenuptial agreements," but instead advised that courts should consider such agreements "in the light of the circumstances surrounding that particular case, and enforce or annul the agreement according to the facts before it." Id. at 1031.
 
 
 15
 In this case, the district court found the following facts relevant to Ms. Gant's pre-agreement knowledge:
 
 
 16
 7.... Geneva at the time of the courtship was educated, matrimonially experienced, intelligent, capable in business and generally well informed and knowledgable.
 
 
 17
 8.... [P]rior to the marriage, Jesse and Geneva discussed insurance benefits which would inure to Geneva upon the death of Jesse.
 
 
 18
 9.... Geneva was aware by her travels with Jesse during the courtship ... that Jesse had a pecuniary interest in the various businesses as well as other customary assets of a typical businessman.
 
 
 19
 10.... Geneva had a generally accurate knowledge of Jesse's businesses.
 
 
 20
 Appellant's App. at 16-17. Also, responding to Ms. Gant's claim that she did not understand the effect of the agreement, the district court found that, after the Gants were married, "Geneva declared and acknowledged to one or more of Jesse's children that she was completely aware that she was not to receive any interest in the companies owned by Jesse." Id. at 19.
 
 
 21
 We review these findings for clear error, which means we accept them unless they are "without factual support in the record," or, after reviewing the entire record we are left with a "definite and firm conviction that a mistake has been made." Las Vega Ice & Cold Storage v. Far West Bank, 893 F.2d 1182, 1185 (10th Cir.1990) (quoting LeMaire ex rel. LeMaire v. United States, 826 F.2d 949, 953 (10th Cir.1987)); see also Fed.R.Civ.P. 52(a) (requiring that we give "due regard" to the trial court's opportunity to judge the credibility of the witnesses). Having examined the record, we cannot say that the district court's findings of fact were clearly erroneous.
 
 
 22
 Resolving inconsistencies in the evidence in favor of the findings, the record shows the following: Ms. Gant admitted she spent "most" of her time with Jesse during their six-month courtship--"nearly every night" after becoming well acquainted. Trial Tr. at 141. Together, they toured the expansive physical facilities of two or three of Jesse's paper and box manufacturing companies, and she admitted knowing that he was the owner of at least one of them. Id. at 142-43, 146-48, 336-37. They took a trip to Las Vegas together, at the expense of one of Jesse's companies. Id. at 302-03. Jesse's daughter, Sharon Sparks, testified that Jesse talked incessantly about his businesses with "everyone," including social acquaintances. Id. at 275-76.
 
 
 23
 Further, Ms. Gant had recently earned a college degree in business, so she had a general understanding of money and basic business concepts. Having been through two divorces, it is also fair to assume she was generally aware of the implications of marriage, and the termination thereof, on property rights.
 
 
 24
 Ms. Gant accurately contends, however, that the record does not show (directly, at least) that she knew of Jesse's stock ownership in five different corporations, or the exact or approximate value of this stock, or that he owned the sixteen-acre parcel of real estate on which one of his manufacturing plants was built, or what that land was worth. In short, Ms. Gant contends that without more specific knowledge she could not effectively waive her marital right to share in Jesse's estate.
 
 
 25
 We are left with deciding on these facts, under Oklahoma law, whether Ms. Gant was adequately "aware to all intents and purposes of the nature, character and value" of Jesse's estate to make a valid antenuptial agreement. See Cobb, 305 P.2d at 1032. Our decision is not an easy one; there are few cases to guide us.
 
 
 26
 The Oklahoma Supreme Court did not apply the standard announced in Cobb to those facts, and has never decided a case such as this one, where the validity of an antenuptial agreement depends on one party's knowledge--obtained independent from disclosure--of the other's worth. Cf. Freeman v. Freeman, 565 P.2d 365, 367 (Okla.1977) (antenuptial contract held valid where husband disclosed his assets in the contract and wife put her initials in the margin acknowledging the disclosure); see generally James O. Pearson, Jr., Annotation, Failure to Disclose Extent or Value of Property Owned as Ground for Avoiding Premarital Contract, 3 A.L.R. 5th 394 (1993).
 
 
 27
 The Oklahoma Court of Appeals faced this issue squarely, however, in In re Estate of Burgess, 646 P.2d 623, 627-28 (Okla. Ct.App.1982). There, the question was: where no disclosure of assets had been made to Mrs. Burgess, did she have sufficient knowledge of her intended husband's worth to make a valid antenuptial agreement? Mrs. Burgess's knowledge at the time of the agreement was hardly specific. She had known Mr. Burgess for some eighteen months. Id. at 624. She knew he owned rental property, and she knew he had a large (thirty-five acre) tract of land, and some of the history behind it, because she had ridden over the land with him on horseback. Id. at 627. There is no indication that she knew what the land was worth, or that she had any special expertise in estimating real estate value. The court of appeals concluded on these facts that Mrs. Burgess had a "generally accurate awareness of the extent of her betrothed's property," sufficient to render their antenuptial agreement enforceable. Id.[6]
 
 
 28
 Notably, the court of appeals in Burgess went on to identify "[a]dditional circumstances ... of consequence" to its decision. Id. at 628. It noted that Mrs. Burgess was a "mature, intelligent woman who had worked in the business world"; that both parties were full adults in their fifties at the time of the agreement; both had been married and divorced, and had grown children from previous marriages. Id. The court further noted that Mrs. Burgess, who retained the homestead, would not be left penniless if the agreement was upheld. Id.
 
 
 29
 The facts in the present case are certainly comparable to those in Burgess. Ms. Gant, however, strenuously objects to using Burgess as a guidepost to Oklahoma law, citing a state statute and rule declaring that Oklahoma Court of Appeals opinions are not binding precedent unless designated for publication by the Oklahoma Supreme Court (which Burgess was not). See Okla. Stat. Ann. tit. 20, 30.5, 30.14; Okla. R.App. P. (Civil Cases) 1.200(C)(B). Nevertheless, these rules--as well as our own rules--permit us to view Burgess as "persuasive."
 
 
 30
 When interpreting state law in diversity cases, we are "obligated to follow the pronouncements of that state's highest court." Romero v. International Harvester Co., 979 F.2d 1444, 1449 n. 3 (10th Cir.1992). Intermediate court rulings are, of course, given less weight, but if the state's highest court has not addressed an issue, an intermediate court's ruling on that point is "not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." West v. American Tel. & Tel., 311 U.S. 223, 236-37 (1940); see also Daigle v. Shell Oil Co., 972 F.2d 1527, 1543 (10th Cir.1992); Delano v. Kitch, 663 F.2d 990, 996 (10th Cir.1981), cert. denied, 456 U.S. 946 (1982). Accordingly, we have previously elected to apply principles of law set forth in Oklahoma Court of Appeals opinions as the law of Oklahoma where we had no other authority and no persuasive data convincing us to do otherwise. See Doyle v. Trinity Sav. & Loan Ass'n, 869 F.2d 558, 559 (10th Cir.1989); O'Neil v. Great Plains Women's Health Clinic, 759 F.2d 787, 789-90 (10th Cir.1985).
 
 
 31
 We have not been presented with a persuasive case for rejecting Burgess as a yardstick.[7] Our own research shows that Burgess perhaps falls on the lenient side towards antenuptial agreements when compared with results reached in comparable cases in other jurisdictions, but we could hardly consider it a gross aberration. See Annotation, 3 A.L.R. 5th at 500-15. The fundamental issue in all of these cases is, as Cobb stated, whether the antenuptial agreement was "fairly procured," 305 P.2d at Syl. 1/22, and we are convinced in light of all the circumstances in this case that the Gants' agreement met that test.
 
 
 32
 For the reasons expressed above, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [2]
 The Honorable Edwin L. Mechem, Senior District Judge, United States District Court for the District of New Mexico, sitting by designation
 
 
 [3]
 The record does not indicate Jesse's net worth in 1983, before his marriage to Geneva. One witness estimated Jesse's holdings at the time of his death, in 1991, to be worth about five million dollars. That figure, however, was not supported by any documentary evidence and is largely irrelevant because the central issue in this case concerns Geneva's knowledge at the time the antenuptial agreement was made
 
 
 [4]
 "Federal courts sitting in diversity must apply the substantive law, including choice of law rules, of the state in which they sit." Taylor v. Phelan, 9 F.3d 882, 885 (10th Cir.1994); see also Klaxon Co. v. Stentor Elec. Manuf. Co., 313 U.S. 487, 496 (1941); Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). In Oklahoma, which is the forum state, the general rule is that validity and interpretation of a contract is governed by the law where the contract is made. Okla. Stat. Ann. tit. 15, 162; Bohannan v. Allstate Ins. Co., 820 P.2d 787, 793 (Okla.1991); Telex Corp. v. Hamilton, 576 P.2d 767, 768 (Okla.1978). The Gants signed their antenuptial agreement in Oklahoma, so under the general rule, Oklahoma law applies. Since neither party argues otherwise, we will not consider whether an exception to the general rule is warranted by the fact that the Gants lived in Texas the entire time they were married
 
 
 [5]
 The agreement did state, unambiguously, that "each has entered into this agreement with full knowledge of the nature and probable value of the estate of the other." Apparently, however, the plaintiffs did not argue in the district court--and have not argued here--that this provision alone establishes that Ms. Gant had the requisite knowledge when she signed the agreement. While the plaintiffs cite this provision as proof of her knowledge, they seem to concede that the heightened scrutiny directed by Cobb, 305 P.2d at 1031, requires us to look beyond the face of the agreement for evidence of Ms. Gant's actual knowledge. That may be correct, but Oklahoma courts have not addressed the question, and we will leave it open since it was not raised here
 
 
 [6]
 Cf. Taylor v. Taylor, 832 P.2d 429, 431 (Okla. Ct.App.1991) (court found Wife's pre-agreement awareness of Husband's assets sufficient where she knew he owned a cattle business, real property, a service station, and stocks, and had assisted him in business and personal matters prior to the marriage); In re Estate of Baggerly, 635 P.2d 1333, 1335 (Okla. Ct.App.1981) (court reversed finding of fraud in connection with antenuptial agreement; noted that intended wife knew at the time of the agreement that her prospective husband was a "well-respected businessman of means in Edmond," that he was part-owner of a successful funeral home, and that he was an only child who stood to inherit the family estate)
 
 
 [7]
 We note that the Oklahoma Court of Appeals denied Mrs. Burgess's petition for rehearing, and then the Oklahoma Supreme Court denied her petition for certiorari. Burgess, 646 P.2d at 623